# YOUNGER, DISTRICT ATTORNEY OF LOS ANGELES COUNTY *v.* HARRIS ET AL.

No. 2.   Argued April 1, 1969—Reargued April 29 and November 16, 1970—Decided February 23, 1971

BLACK, J., delivered the opinion of the Court, in which BURGER, C. J., and HARLAN, STEWART, and BLACKMUN, JJ., joined. STEWART, J., filed a concurring opinion, in which HARLAN, J., joined, *post*, p. 54. BRENNAN, J., filed an opinion concurring in the result, in which WHITE and MARSHALL, JJ., joined, *post*, p. 56. DOUGLAS, J., filed a dissenting opinion, *post*, p. 58.

*Clifford K. Thompson, Jr.,* Deputy Attorney General of California, argued the cause for appellant on the second reargument. *Albert W. Harris, Jr.,* Assistant Attorney General, argued the cause for appellant on the original argument and on the first reargument. With them on the briefs were *Thomas C. Lynch,* Attorney General, and *Evelle J. Younger, pro se.*

*A. L. Wirin* argued the cause for appellees on the rearguments. With him on the briefs were *Fred Okrand* and *Frank S. Pestana. Sam Rosenwein* argued the cause for appellees on the original argument. With him on the brief was *Mr. Pestana.*

MR. JUSTICE BLACK delivered the opinion of the Court.

Appellee, John Harris, Jr., was indicted in a California state court, charged with violation of the California Penal Code §§ 11400 and 11401, known as the California Criminal Syndicalism Act, set out below.[1] He then filed

---

[1] "§ 11400. *Definition*

" 'Criminal syndicalism' as used in this article means any doctrine or precept advocating, teaching or aiding and abetting the commission of crime, sabotage (which word is hereby defined as meaning wilful and malicious physical damage or injury to physical property), or unlawful acts of force and violence or unlawful methods of terrorism as a means of accomplishing a change in industrial ownership or control, or effecting any political change."

"§ 11401. *Offense; punishment*

"Any person who:

"1. By spoken or written words or personal conduct advocates, teaches or aids and abets criminal syndicalism or the duty, necessity or propriety of committing crime, sabotage, violence or any unlawful

a complaint in the Federal District Court, asking that court to enjoin the appellant, Younger, the District Attorney of Los Angeles County, from prosecuting him, and alleging that the prosecution and even the presence of the Act inhibited him in the exercise of his rights of free speech and press, rights guaranteed him by the First and Fourteenth Amendments. Appellees Jim Dan and Diane Hirsch intervened as plaintiffs in the suit, claiming that the prosecution of Harris would inhibit them as members of the Progressive Labor Party from peacefully advocating the program of their party, which was to replace capitalism with socialism and to abolish the profit system of production in this country. Appellee Farrell Broslawsky, an instructor in history at Los Angeles Valley College, also intervened claiming that the prosecution of Harris made him uncertain as to whether he could

---

method of terrorism as a means of accomplishing a change in industrial ownership or control, or effecting any political change; or

"2. Wilfully and deliberately by spoken or written words justifies or attempts to justify criminal syndicalism or the commission or attempt to commit crime, sabotage, violence or unlawful methods of terrorism with intent to approve, advocate or further the doctrine of criminal syndicalism; or

"3. Prints, publishes, edits, issues or circulates or publicly displays any book, paper, pamphlet, document, poster or written or printed matter in any other form, containing or carrying written or printed advocacy, teaching, or aid and abetment of, or advising, criminal syndicalism; or

"4. Organizes or assists in organizing, or is or knowingly becomes a member of, any organization, society, group or assemblage of persons organized or assembled to advocate, teach or aid and abet criminal syndicalism; or

"5. Wilfully by personal act or conduct, practices or commits any act advised, advocated, taught or aided and abetted by the doctrine or precept of criminal syndicalism, with intent to accomplish a change in industrial ownership or control, or effecting any political change;

"Is guilty of a felony and punishable by imprisonment in the state prison not less than one nor more than 14 years."

teach about the doctrines of Karl Marx or read from the Communist Manifesto as part of his classwork. All claimed that unless the United States court restrained the state prosecution of Harris each would suffer immediate and irreparable injury. A three-judge Federal District Court, convened pursuant to 28 U. S. C. § 2284, held that it had jurisdiction and power to restrain the District Attorney from prosecuting, held that the State's Criminal Syndicalism Act was void for vagueness and overbreadth in violation of the First and Fourteenth Amendments, and accordingly restrained the District Attorney from "further prosecution of the currently pending action against plaintiff Harris for alleged violation of the Act." 281 F. Supp. 507, 517 (1968).

The case is before us on appeal by the State's District Attorney Younger, pursuant to 28 U. S. C. § 1253. In his notice of appeal and his jurisdictional statement appellant presented two questions: (1) whether the decision of this Court in *Whitney* v. *California,* 274 U. S. 357, holding California's law constitutional in 1927 was binding on the District Court and (2) whether the State's law is constitutional on its face. In this Court the brief for the State of California, filed at our request, also argues that only Harris, who was indicted, has standing to challenge the State's law, and that issuance of the injunction was a violation of a longstanding judicial policy and of 28 U. S. C. § 2283, which provides:

> "A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments."

See, *e. g., Atlantic Coast Line R. Co.* v. *Engineers,* 398 U. S. 281, 285–286 (1970). Without regard to the ques-

tions raised about *Whitney* v. *California, supra,* since overruled by *Brandenburg* v. *Ohio,* 395 U. S. 444 (1969), or the constitutionality of the state law, we have concluded that the judgment of the District Court, enjoining appellant Younger from prosecuting under these California statutes, must be reversed as a violation of the national policy forbidding federal courts to stay or enjoin pending state court proceedings except under special circumstances.[2] We express no view about the circumstances under which federal courts may act when there is no prosecution pending in state courts at the time the federal proceeding is begun.

## I

Appellee Harris has been indicted, and was actually being prosecuted by California for a violation of its Criminal Syndicalism Act at the time this suit was filed. He thus has an acute, live controversy with the State and its prosecutor. But none of the other parties plaintiff in the District Court, Dan, Hirsch, or Broslawsky, has such a controversy. None has been indicted, arrested, or even threatened by the prosecutor. About these three the three-judge court said:

> "Plaintiffs Dan and Hirsch allege that they are members of the Progressive Labor Party, which advocates change in industrial ownership and political change, and that they feel inhibited in advo-

---

[2] Appellees did not explicitly ask for a declaratory judgment in their complaint. They did, however, ask the District Court to grant "such other and further relief as to the Court may seem just and proper," and the District Court in fact granted a declaratory judgment. For the reasons stated in our opinion today in *Samuels* v. *Mackell, post,* p. 66, we hold that declaratory relief is also improper when a prosecution involving the challenged statute is pending in state court at the time the federal suit is initiated.

cating the program of their political party through peaceful, non-violent means, because of the presence of the Act 'on the books,' and because of the pending criminal prosecution against Harris. Plaintiff Broslawsky is a history instructor, and he alleges that he is uncertain as to whether his normal practice of teaching his students about the doctrines of Karl Marx and reading from the Communist Manifesto and other revolutionary works may subject him to prosecution for violation of the Act." 281 F. Supp., at 509.

Whatever right Harris, who is being prosecuted under the state syndicalism law may have, Dan, Hirsch, and Broslawsky cannot share it with him. If these three had alleged that they would be prosecuted for the conduct they planned to engage in, and if the District Court had found this allegation to be true—either on the admission of the State's district attorney or on any other evidence—then a genuine controversy might be said to exist. But here appellees Dan, Hirsch, and Broslawsky do not claim that they have ever been threatened with prosecution, that a prosecution is likely, or even that a prosecution is remotely possible. They claim the right to bring this suit solely because, in the language of their complaint, they "feel inhibited." We do not think this allegation, even if true, is sufficient to bring the equitable jurisdiction of the federal courts into play to enjoin a pending state prosecution. A federal lawsuit to stop a prosecution in a state court is a serious matter. And persons having no fears of state prosecution except those that are imaginary or speculative, are not to be accepted as appropriate plaintiffs in such cases. See *Golden* v. *Zwickler,* 394 U. S. 103 (1969). Since Harris is actually being prosecuted under the challenged laws, however, we proceed with him as a proper party.

## II

Since the beginning of this country's history Congress has, subject to few exceptions, manifested a desire to permit state courts to try state cases free from interference by federal courts. In 1793 an Act unconditionally provided: "[N]or shall a writ of injunction be granted to stay proceedings in any court of a state . . . ." 1 Stat. 335, c. 22, § 5. A comparison of the 1793 Act with 28 U. S. C. § 2283, its present-day successor, graphically illustrates how few and minor have been the exceptions granted from the flat, prohibitory language of the old Act. During all this lapse of years from 1793 to 1970 the statutory exceptions to the 1793 congressional enactment have been only three: (1) "except as expressly authorized by Act of Congress"; (2) "where necessary in aid of its jurisdiction"; and (3) "to protect or effectuate its judgments." In addition, a judicial exception to the longstanding policy evidenced by the statute has been made where a person about to be prosecuted in a state court can show that he will, if the proceeding in the state court is not enjoined, suffer irreparable damages. See *Ex parte Young,* 209 U. S. 123 (1908).[3]

The precise reasons for this longstanding public policy against federal court interference with state court proceedings have never been specifically identified but the primary sources of the policy are plain. One is the basic doctrine of equity jurisprudence that courts of equity should not act, and particularly should not act to restrain a criminal prosecution, when the moving party has an adequate remedy at law and will not suffer irreparable

[3] For an interesting discussion of the history of this congressional policy up to 1941, see *Toucey* v. *New York Life Ins. Co.,* 314 U. S. 118 (1941).

44

injury if denied equitable relief. The doctrine may originally have grown out of circumstances peculiar to the English judicial system and not applicable in this country, but its fundamental purpose of restraining equity jurisdiction within narrow limits is equally important under our Constitution, in order to prevent erosion of the role of the jury and avoid a duplication of legal proceedings and legal sanctions where a single suit would be adequate to protect the rights asserted. This underlying reason for restraining courts of equity from interfering with criminal prosecutions is reinforced by an even more vital consideration, the notion of "comity," that is, a proper respect for state functions, a recognition of the fact that the entire country is made up of a Union of separate state governments, and a continuance of the belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways. This, perhaps for lack of a better and clearer way to describe it, is referred to by many as "Our Federalism," and one familiar with the profound debates that ushered our Federal Constitution into existence is bound to respect those who remain loyal to the ideals and dreams of "Our Federalism." The concept does not mean blind deference to "States' Rights" any more than it means centralization of control over every important issue in our National Government and its courts. The Framers rejected both these courses. What the concept does represent is a system in which there is sensitivity to the legitimate interests of both State and National Governments, and in which the National Government, anxious though it may be to vindicate and protect federal rights and federal interests, always endeavors to do so in ways that will not unduly interfere with the legitimate activities of the States. It should never be forgotten that this slogan, "Our Federalism," born in the early struggling days of

our Union of States, occupies a highly important place in our Nation's history and its future.

This brief discussion should be enough to suggest some of the reasons why it has been perfectly natural for our cases to repeat time and time again that the normal thing to do when federal courts are asked to enjoin pending proceedings in state courts is not to issue such injunctions. In *Fenner* v. *Boykin,* 271 U. S. 240 (1926), suit had been brought in the Federal District Court seeking to enjoin state prosecutions under a recently enacted state law that allegedly interfered with the free flow of interstate commerce. The Court, in a unanimous opinion made clear that such a suit, even with respect to state criminal proceedings not yet formally instituted, could be proper only under very special circumstances:

> "*Ex parte Young,* 209 U. S. 123, and following cases have established the doctrine that when absolutely necessary for protection of constitutional rights courts of the United States have power to enjoin state officers from instituting criminal actions. But this may not be done except under extraordinary circumstances where the danger of irreparable loss is both great and immediate. Ordinarily, there should be no interference with such officers; primarily, they are charged with the duty of prosecuting offenders against the laws of the State and must decide when and how this is to be done. The accused should first set up and rely upon his defense in the state courts, even though this involves a challenge of the validity of some statute, unless it plainly appears that this course would not afford adequate protection." *Id.,* at 243–244.

These principles, made clear in the *Fenner* case, have been repeatedly followed and reaffirmed in other cases involving threatened prosecutions. See, *e. g., Spielman Motor*

*Sales Co.* v. *Dodge,* 295 U. S. 89 (1935); *Beal* v. *Missouri Pac. R. Co.,* 312 U. S. 45 (1941); *Watson* v. *Buck,* 313 U. S. 387 (1941); *Williams* v. *Miller,* 317 U. S. 599 (1942); *Douglas* v. *City of Jeannette,* 319 U. S. 157 (1943).

In all of these cases the Court stressed the importance of showing irreparable injury, the traditional prerequisite to obtaining an injunction. In addition, however, the Court also made clear that in view of the fundamental policy against federal interference with state criminal prosecutions, even irreparable injury is insufficient unless it is "both great and immediate." *Fenner, supra.* Certain types of injury, in particular, the cost, anxiety, and inconvenience of having to defend against a single criminal prosecution, could not by themselves be considered "irreparable" in the special legal sense of that term. Instead, the threat to the plaintiff's federally protected rights must be one that cannot be eliminated by his defense against a single criminal prosecution. See, *e. g., Ex parte Young, supra,* at 145–147. Thus, in the *Buck* case, *supra,* at 400, we stressed:

> "Federal injunctions against state criminal statutes, either in their entirety or with respect to their separate and distinct prohibitions, are not to be granted as a matter of course, even if such statutes are unconstitutional. 'No citizen or member of the community is immune from prosecution, in good faith, for his alleged criminal acts. The imminence of such a prosecution even though alleged to be unauthorized and hence unlawful is not alone ground for relief in equity which exerts its extraordinary powers only to prevent irreparable injury to the plaintiff who seeks its aid.' *Beal* v. *Missouri Pacific Railroad Corp.,* 312 U. S. 45, 49."

And similarly, in *Douglas, supra,* we made clear, after reaffirming this rule, that:

> "It does not appear from the record that petitioners have been threatened with any injury other than that incidental to every criminal proceeding brought lawfully and in good faith . . . ." 319 U. S., at 164.

This is where the law stood when the Court decided *Dombrowski* v. *Pfister,* 380 U. S. 479 (1965), and held that an injunction against the enforcement of certain state criminal statutes could properly issue under the circumstances presented in that case.[4] In *Dombrowski,*

---

[4] Neither the cases dealing with standing to raise claims of vagueness or overbreadth, *e. g., Thornhill* v. *Alabama,* 310 U. S. 88 (1940), nor the loyalty oath cases, *e. g., Baggett* v. *Bullitt,* 377 U. S. 360 (1964), changed the basic principles governing the propriety of injunctions against state criminal prosecutions. In the standing cases we allowed attacks on overly broad or vague statutes in the absence of any showing that the defendant's conduct could not be regulated by some properly drawn statute. But in each of these cases the statute was not merely vague or overly broad "on its face"; the statute was held to be vague or overly broad as construed and *applied* to a particular defendant in a particular case. If the statute had been too vague as written but sufficiently narrow as applied, prosecutions and convictions under it would ordinarily have been permissible. See *Dombrowski, supra,* at 491 n. 7.

In *Baggett* and similar cases we enjoined state officials from discharging employees who failed to take certain loyalty oaths. We held that the States were without power to exact the promises involved, with their vague and uncertain content concerning advocacy and political association, as a condition of employment. Apart from the fact that any plaintiff discharged for exercising his constitutional right to refuse to take the oath would have had no adequate remedy at law, the relief sought was of course the kind that raises no special problem—an injunction against allegedly unconstitutional state action (discharging the employees) that is not part of a criminal prosecution.

unlike many of the earlier cases denying injunctions, the complaint made substantial allegations that:

> "the threats to enforce the statutes against appellants are not made with any expectation of securing valid convictions, but rather are part of a plan to employ arrests, seizures, and threats of prosecution under color of the statutes to harass appellants and discourage them and their supporters from asserting and attempting to vindicate the constitutional rights of Negro citizens of Louisiana."   380 U. S., at 482.

The appellants in *Dombrowski* had offered to prove that their offices had been raided and all their files and records seized pursuant to search and arrest warrants that were later summarily vacated by a state judge for lack of probable cause.   They also offered to prove that despite the state court order quashing the warrants and suppressing the evidence seized, the prosecutor was continuing to threaten to initiate new prosecutions of appellants under the same statutes, was holding public hearings at which photostatic copies of the illegally seized documents were being used, and was threatening to use other copies of the illegally seized documents to obtain grand jury indictments against the appellants on charges of violating the same statutes.   These circumstances, as viewed by the Court sufficiently establish the kind of irreparable injury, above and beyond that associated with the defense of a single prosecution brought in good faith, that had always been considered sufficient to justify federal intervention.   See, *e. g., Beal, supra,* at 50.   Indeed, after quoting the Court's statement in *Douglas* concerning the very restricted circumstances under which an injunction could be justified, the Court in *Dombrowski* went on to say:

> "But the allegations in this complaint depict a situation in which defense of the State's criminal

> prosecution will not assure adequate vindication of constitutional rights. They suggest that a substantial loss of or impairment of freedoms of expression will occur if appellants must await the state court's disposition and ultimate review in this Court of any adverse determination. These allegations, if true, clearly show irreparable injury." 380 U. S., at 485–486.

And the Court made clear that even under these circumstances the District Court issuing the injunction would have continuing power to lift it at any time and remit the plaintiffs to the state courts if circumstances warranted. 380 U. S., at 491, 492. Similarly, in *Cameron* v. *Johnson,* 390 U. S. 611 (1968), a divided Court denied an injunction after finding that the record did not establish the necessary bad faith and harassment; the dissenting Justices themselves stressed the very limited role to be allowed for federal injunctions against state criminal prosecutions and differed with the Court only on the question whether the particular facts of that case were sufficient to show that the prosecution was brought in bad faith.

It is against the background of these principles that we must judge the propriety of an injunction under the circumstances of the present case. Here a proceeding was already pending in the state court, affording Harris an opportunity to raise his constitutional claims. There is no suggestion that this single prosecution against Harris is brought in bad faith or is only one of a series of repeated prosecutions to which he will be subjected. In other words, the injury that Harris faces is solely "that incidental to every criminal proceeding brought lawfully and in good faith," *Douglas, supra,* and therefore under the settled doctrine we have already described he is not entitled to equitable relief "even if such statutes are unconstitutional," *Buck, supra.*

The District Court, however, thought that the *Dombrowski* decision substantially broadened the availability of injunctions against state criminal prosecutions and that under that decision the federal courts may give equitable relief, without regard to any showing of bad faith or harassment, whenever a state statute is found "on its face" to be vague or overly broad, in violation of the First Amendment. We recognize that there are some statements in the *Dombrowski* opinion that would seem to support this argument. But, as we have already seen, such statements were unnecessary to the decision of that case, because the Court found that the plaintiffs had alleged a basis for equitable relief under the long-established standards. In addition, we do not regard the reasons adduced to support this position as sufficient to justify such a substantial departure from the established doctrines regarding the availability of injunctive relief. It is undoubtedly true, as the Court stated in *Dombrowski*, that "[a] criminal prosecution under a statute regulating expression usually involves imponderables and contingencies that themselves may inhibit the full exercise of First Amendment freedoms." 380 U. S., at 486. But this sort of "chilling effect," as the Court called it, should not by itself justify federal intervention. In the first place, the chilling effect cannot be satisfactorily eliminated by federal injunctive relief. In *Dombrowski* itself the Court stated that the injunction to be issued there could be lifted if the State obtained an "acceptable limiting construction" from the state courts. The Court then made clear that once this was done, prosecutions could then be brought for conduct occurring before the narrowing construction was made, and proper convictions could stand so long as the defendants were not deprived of fair warning. 380 U. S., at 491 n. 7. The kind of relief granted in *Dombrowski* thus does not effectively eliminate uncertainty as to the coverage of the state

statute and leaves most citizens with virtually the same doubts as before regarding the danger that their conduct might eventually be subjected to criminal sanctions. The chilling effect can, of course, be eliminated by an injunction that would prohibit any prosecution whatever for conduct occurring prior to a satisfactory rewriting of the statute. But the States would then be stripped of all power to prosecute even the socially dangerous and constitutionally unprotected conduct that had been covered by the statute, until a new statute could be passed by the state legislature and approved by the federal courts in potentially lengthy trial and appellate proceedings. Thus, in *Dombrowski* itself the Court carefully reaffirmed the principle that even in the direct prosecution in the State's own courts, a valid narrowing construction can be applied to conduct occurring prior to the date when the narrowing construction was made, in the absence of fair warning problems.

Moreover, the existence of a "chilling effect," even in the area of First Amendment rights, has never been considered a sufficient basis, in and of itself, for prohibiting state action. Where a statute does not directly abridge free speech, but—while regulating a subject within the State's power—tends to have the incidental effect of inhibiting First Amendment rights, it is well settled that the statute can be upheld if the effect on speech is minor in relation to the need for control of the conduct and the lack of alternative means for doing so. *Schneider* v. *State,* 308 U. S. 147 (1939); *Cantwell* v. *Connecticut,* 310 U. S. 296 (1940); *Mine Workers* v. *Illinois Bar Assn.,* 389 U. S. 217 (1967). Just as the incidental "chilling effect" of such statutes does not automatically render them unconstitutional, so the chilling effect that admittedly can result from the very existence of certain laws on the statute books does not in itself justify prohibiting the State from carrying out the im-

portant and necessary task of enforcing these laws against socially harmful conduct that the State believes in good faith to be punishable under its laws and the Constitution.

Beyond all this is another, more basic consideration. Procedures for testing the constitutionality of a statute "on its face" in the manner apparently contemplated by *Dombrowski,* and for then enjoining all action to enforce the statute until the State can obtain court approval for a modified version, are fundamentally at odds with the function of the federal courts in our constitutional plan. The power and duty of the judiciary to declare laws unconstitutional is in the final analysis derived from its responsibility for resolving concrete disputes brought before the courts for decision; a statute apparently governing a dispute cannot be applied by judges, consistently with their obligations under the Supremacy Clause, when such an application of the statute would conflict with the Constitution. *Marbury* v. *Madison,* 1 Cranch 137 (1803). But this vital responsibility, broad as it is, does not amount to an unlimited power to survey the statute books and pass judgment on laws before the courts are called upon to enforce them. Ever since the Constitutional Convention rejected a proposal for having members of the Supreme Court render advice concerning pending legislation [5] it has been clear that, even when suits of this kind involve a "case or controversy" sufficient to satisfy the requirements of Article III of the Constitution, the task of analyzing a proposed statute, pinpointing its deficiencies, and requiring correction of these deficiencies before the statute is put into effect, is rarely if ever an appropriate task for the judi-

---

[5] See 1 The Records of the Federal Convention of 1787, p. 21 (Farrand ed. 1911).

ciary. The combination of the relative remoteness of the controversy, the impact on the legislative process of the relief sought, and above all the speculative and amorphous nature of the required line-by-line analysis of detailed statutes, see, *e. g., Landry* v. *Daley,* 280 F. Supp. 938 (ND Ill. 1968), rev'd *sub nom. Boyle* v. *Landry, post,* p. 77, ordinarily results in a kind of case that is wholly unsatisfactory for deciding constitutional questions, whichever way they might be decided. In light of this fundamental conception of the Framers as to the proper place of the federal courts in the governmental processes of passing and enforcing laws, it can seldom be appropriate for these courts to exercise any such power of prior approval or veto over the legislative process.

For these reasons, fundamental not only to our federal system but also to the basic functions of the Judicial Branch of the National Government under our Constitution, we hold that the *Dombrowski* decision should not be regarded as having upset the settled doctrines that have always confined very narrowly the availability of injunctive relief against state criminal prosecutions. We do not think that opinion stands for the proposition that a federal court can properly enjoin enforcement of a statute solely on the basis of a showing that the statute "on its face" abridges First Amendment rights. There may, of course, be extraordinary circumstances in which the necessary irreparable injury can be shown even in the absence of the usual prerequisites of bad faith and harassment. For example, as long ago as the *Buck* case, *supra,* we indicated:

> "It is of course conceivable that a statute might be flagrantly and patently violative of express constitutional prohibitions in every clause, sentence and paragraph, and in whatever manner and against

whomever an effort might be made to apply it."
313 U. S., at 402.

Other unusual situations calling for federal intervention
might also arise, but there is no point in our attempting
now to specify what they might be. It is sufficient for
purposes of the present case to hold, as we do, that
the possible unconstitutionality of a statute "on its face"
does not in itself justify an injunction against good-
faith attempts to enforce it, and that appellee Harris
has failed to make any showing of bad faith, harassment,
or any other unusual circumstance that would call for
equitable relief. Because our holding rests on the ab-
sence of the factors necessary under equitable principles
to justify federal intervention, we have no occasion to
consider whether 28 U. S. C. § 2283, which prohibits
an injunction against state court proceedings "except as
expressly authorized by Act of Congress" would in and
of itself be controlling under the circumstances of this
case.

The judgment of the District Court is reversed, and
the case is remanded for further proceedings not incon-
sistent with this opinion.

*Reversed.*

MR. JUSTICE STEWART, with whom MR. JUSTICE HARLAN
joins, concurring.*

The questions the Court decides today are important
ones. Perhaps as important, however, is a recognition
of the areas into which today's holdings do not neces-
sarily extend. In all of these cases, the Court deals only

---

*[This opinion applies also to No. 7, *Samuels et al.* v. *Mackell et
al.*, and No. 9, *Fernandez* v. *Mackell et al.*, *post*, p. 66; No. 41,
*Dyson et al.* v. *Stein*, *post*, p. 200; and No. 83, *Byrne et al.* v. *Kara-
lexis et al.*, *post*, p. 216.]

with the proper policy to be followed by a federal court when asked to intervene by injunction or declaratory judgment in a criminal prosecution which is contemporaneously pending in a state court.

In basing its decisions on policy grounds, the Court does not reach any questions concerning the independent force of the federal anti-injunction statute, 28 U. S. C. § 2283. Thus we do not decide whether the word "injunction" in § 2283 should be interpreted to include a declaratory judgment, or whether an injunction to stay proceedings in a state court is "expressly authorized" by § 1 of the Civil Rights Act of 1871, now 42 U. S. C. § 1983.[1] And since all these cases involve state criminal prosecutions, we do not deal with the considerations that should govern a federal court when it is asked to intervene in state civil proceedings, where, for various reasons, the balance might be struck differently.[2] Finally, the Court today does not resolve the problems involved when a federal court is asked to give injunctive or declaratory relief from *future* state criminal prosecutions.

---

[1] See also *Cameron* v. *Johnson*, 390 U. S. 611, 613–614, n. 3; *Dombrowski* v. *Pfister*, 380 U. S. 479, 484 n. 2.

[2] Courts of equity have traditionally shown greater reluctance to intervene in criminal prosecutions than in civil cases. See *ante,* at 43–44; *Douglas* v. *City of Jeannette*, 319 U. S. 157, 163–164. The offense to state interests is likely to be less in a civil proceeding. A State's decision to classify conduct as criminal provides some indication of the importance it has ascribed to prompt and unencumbered enforcement of its law. By contrast, the State might not even be a party in a proceeding under a civil statute.

Cf. *Law Students Civil Rights Research Council* v. *Wadmond*, *post*, p. 154; *Wisconsin* v. *Constantineau*, 400 U. S. 433; *Rosado* v. *Wyman*, 397 U. S. 397.

These considerations would not, to be sure, support any distinction between civil and criminal proceedings should the ban of 28 U. S. C. § 2283, which makes no such distinction, be held unaffected by 42 U. S. C. § 1983.

The Court confines itself to deciding the policy considerations that in our federal system must prevail when federal courts are asked to interfere with pending state prosecutions. Within this area, we hold that a federal court must not, save in exceptional and extremely limited circumstances, intervene by way of either injunction or declaration in an existing state criminal prosecution.[3] Such circumstances exist only when there is a threat of irreparable injury "both great and immediate." A threat of this nature might be shown if the state criminal statute in question were patently and flagrantly unconstitutional on its face, *ante*, at 53–54; cf. *Evers v. Dwyer*, 358 U. S. 202, or if there has been bad faith and harassment—official lawlessness—in a statute's enforcement, *ante*, at 47–49. In such circumstances the reasons of policy for deferring to state adjudication are outweighed by the injury flowing from the very bringing of the state proceedings, by the perversion of the very process that is supposed to provide vindication, and by the need for speedy and effective action to protect federal rights. Cf. *Georgia v. Rachel*, 384 U. S. 780.

Mr. Justice Brennan, with whom Mr. Justice White and Mr. Justice Marshall join, concurring in the result.

I agree that the judgment of the District Court should be reversed. Appellee Harris had been indicted for violations of the California Criminal Syndicalism Act before he sued in federal court. He has not alleged that the prosecution was brought in bad faith to harass him. His constitutional contentions may be adequately adjudi-

---

[3] The negative pregnant in this sentence—that a federal court may, as a matter of policy, intervene when such "exceptional and extremely limited circumstances" are found—is subject to any further limitations that may be placed on such intervention by 28 U. S. C. § 2283.

cated in the state criminal proceeding, and federal inter-
vention at his instance was therefore improper.*

Appellees Hirsch and Dan have alleged that they "feel
inhibited" by the statute and the prosecution of Harris
from advocating the program of the Progressive Labor
Party. Appellee Broslawsky has alleged that he "is un-
certain" whether as an instructor in college history he
can under the statute give instruction relating to the
Communist Manifesto and similar revolutionary works.
None of these appellees has stated any ground for a rea-
sonable expectation that he will actually be prosecuted
under the statute for taking the actions contemplated.
The court below expressly declined to rely on any finding
"that . . . Dan, Hirsch or Broslawsky stand[s] in any
danger of prosecution by the [State], because of the
activities that they ascribed to themselves in the com-

---

*The District Court erroneously interpreted *Zwickler* v. *Koota*,
389 U. S. 241 (1967), as authorizing federal court consideration of a
constitutional claim at issue in a pending state proceeding, whether or
not the federal court plaintiff had presented his claim to the state
court. It suffices here to note that in *Zwickler* no state proceeding
was pending at the time jurisdiction attached in the federal court.
The court below also thought it significant that appellee Harris had
raised his constitutional claim in the state courts in a motion to dis-
miss the indictment and in petitions in the state appellate courts for
a writ of prohibition. It was questioned at oral argument whether
constitutional issues could properly be raised by the procedures in-
voked by Harris, and it was suggested that the denial of Harris'
motions did not necessarily involve rejection of his constitutional
claims. However, even if the California courts had at that inter-
locutory stage rejected Harris' constitutional arguments, that re-
jection would not have provided a justification for intervening by
the District Court. Harris could have sought direct review of that
rejection of his constitutional claims or he could have renewed the
claims in requests for instructions, and on direct review of any con-
viction in the state courts and in this Court. These were the proper
modes for presentation and these the proper forums for consideration
of the constitutional issues.

plaint . . . ." 281 F. Supp. 507, 516. It is true, as the court below pointed out, that "[w]ell-intentioned prosecutors and judicial safeguards do not neutralize the vice of a vague law," *Baggett* v. *Bullitt,* 377 U. S. 360, 373 (1964), but still there must be a live controversy under Art. III. No threats of prosecution of these appellees are alleged. Although Dan and Hirsch have alleged that they desire to advocate doctrines of the Progressive Labor Party, they have not asserted that their advocacy will be of the same genre as that which brought on the prosecution of Harris. In short, there is no reason to think that California has any ripe controversy with them. See *Golden* v. *Zwickler,* 394 U. S. 103 (1969); *Perez* v. *Ledesma, post,* p. 93 (BRENNAN, J., concurring and dissenting).

MR. JUSTICE DOUGLAS, dissenting.*

The fact that we are in a period of history when enormous extrajudicial sanctions are imposed on those who assert their First Amendment rights in unpopular causes emphasizes the wisdom of *Dombrowski* v. *Pfister,* 380 U. S. 479. There we recognized that in times of repression, when interests with powerful spokesmen generate symbolic pogroms against nonconformists, the federal judiciary, charged by Congress with special vigilance for protection of civil rights, has special responsibilities to prevent an erosion of the individual's constitutional rights.

*Dombrowski* represents an exception to the general rule that federal courts should not interfere with state criminal prosecutions. The exception does not arise merely because prosecutions are threatened to which the First Amendment will be the proffered defense. *Dombrowski* governs statutes which are a blunderbuss by

---

*[This opinion also applies to No. 4, *Boyle, Judge, et al.* v. *Landry et al., post,* p. 77.]

themselves or when used *en masse*—those that have an "overbroad" sweep. "If the rule were otherwise, the contours of regulation would have to be hammered out case by case—and tested only by those hardy enough to risk criminal prosecution to determine the proper scope of regulation." *Id.*, at 487. It was in the context of overbroad state statutes that we spoke of the "chilling effect upon the exercise of First Amendment rights" caused by state prosecutions. *Ibid.*

As respects overbroad statutes we said at least as early as 1940 that when dealing with First Amendment rights we would insist on statutes "narrowly drawn to prevent the supposed evil." *Cantwell* v. *Connecticut,* 310 U. S. 296, 307.

The special circumstances when federal intervention in a state criminal proceeding is permissible are not restricted to bad faith on the part of state officials or the threat of multiple prosecutions. They also exist where for any reason the state statute being enforced is unconstitutional on its face. As Mr. Justice Butler, writing for the Court, said in *Terrace* v. *Thompson,* 263 U. S. 197, 214:

> "Equity jurisdiction will be exercised to enjoin the threatened enforcement of a state law which contravenes the Federal Constitution wherever it is essential in order effectually to protect property rights and the rights of persons against injuries otherwise irremediable; and in such a case a person, who as an officer of the State is clothed with the duty of enforcing its laws and who threatens and is about to commence proceedings, either civil or criminal, to enforce such a law against parties affected, may be enjoined from such action by a federal court of equity."

Our *Dombrowski* decision was only another facet of the same problem.

In *Younger*, "criminal syndicalism" is defined so broadly as to jeopardize "teaching" that socialism is preferable to free enterprise.

Harris' "crime" was distributing leaflets advocating change in industrial ownership through political action. The statute under which he was indicted was the one involved in *Whitney* v. *California*, 274 U. S. 357, a decision we overruled in *Brandenburg* v. *Ohio*, 395 U. S. 444, 449.[1]

If the "advocacy" which Harris used was an attempt at persuasion through the use of bullets, bombs, and arson, we would have a different case. But Harris is charged only with distributing leaflets advocating political action toward his objective. He tried unsuccessfully to have the state court dismiss the indictment on constitutional grounds. He resorted to the state appellate court for writs of prohibition to prevent the trial, but to no avail. He went to the federal court as a matter of last resort in an effort to keep this unconstitutional trial from being saddled on him.

The "anti-injunction" statute, 28 U. S. C. § 2283,[2] is not a bar to a federal injunction under these circumstances. That statute was adopted in 1793, § 5, 1 Stat. 335,[3] and reflected the early view of the proper role of the federal courts within American federalism.

---

[1] See Linde, "Clear and Present Danger" Reexamined: Dissonance in the *Brandenburg* Concerto, 22 Stan. L. Rev. 1163 (1970).

[2] "A court of the United States may not grant an injunction to stay proceedings in a State court *except as expressly authorized by Act of Congress,* or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments." (Emphasis added.)

[3] In its initial form the "anti-injunction" Act provided: "[N]or shall a writ of injunction be granted [by any court of the United States] to stay proceedings in any court of a state." There were no exceptions. In 1874 it was subsequently modified by an insertion of the

Whatever the balance of the pressures of localism and nationalism prior to the Civil War, they were fundamentally altered by the war. The Civil War Amendments made civil rights a national concern. Those Amendments, especially § 5 of the Fourteenth Amendment, cemented the change in American federalism brought on by the war. Congress immediately commenced to use its new powers to pass legislation. Just as the first Judiciary Act, 1 Stat. 73, and the "anti-injunction" statute represented the early views of American federalism, the Reconstruction statutes, including the enlargement of federal jurisdiction,[4] represent a later view of American federalism.

One of the jurisdiction-enlarging statutes passed during Reconstruction was the Act of April 20, 1871. 17

---

Revisers to read: "The writ of injunction shall not be granted by any court of the United States to stay proceedings in any court of a State, except in cases where such injunction may be authorized by any law relating to proceedings in bankruptcy." Rev. Stat. § 720.

In *Toucey* v. *New York Life Ins. Co.,* 314 U. S. 118, 133–134, in discussing the statutory exceptions to the "anti-injunction" Act we noted that, while only bankruptcy was the explicit exception, there were others. (1) The "Removal Acts qualify *pro tanto* the Act of 1793." (2) The Act of 1851 limiting shipowners' liability "[b]eing a 'subsequent statute' to the Act of 1793 . . . operates as an implied legislative amendment to it." We also added (3) the Interpleader Act of 1926 and (4) the Frazier-Lemke Act, 47 Stat. 1473. *Toucey* limited a line of cases dealing with nonstatutory exceptions to the "anti-injunction" Act. Shortly thereafter the current language of § 2283 was written into the Judicial Code. The Reviser's Note states: "[T]he revised section restores the basic law as generally understood and interpreted prior to the Toucey decision." Both pre-*Toucey* and post-*Toucey* decisions recognize implied legislative exceptions to the "anti-injunction" Act. See *Porter* v. *Dicken,* 328 U. S. 252; *Leiter Minerals* v. *United States,* 352 U. S. 220.

[4] What is now 28 U. S. C. § 1343 (3) was added in 1871, 17 Stat. 13, and the federal-question jurisdiction of 28 U. S. C. § 1331 was added in 1875. 18 Stat. 470.

Stat. 13. Beyond its jurisdictional provision that statute, now codified as 42 U. S. C. § 1983, provides:

> "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof *to the deprivation of any rights, privileges, or immunities secured by the Constitution* and laws, shall be liable to the party injured in an action at law, *suit in equity,* or other proper proceeding for redress." (Emphasis added.)

A state law enforcement officer is someone acting under "color of law" even though he may be misusing his authority. *Monroe* v. *Pape,* 365 U. S. 167. And prosecution under a patently unconstitutional statute is a "deprivation of . . . rights, privileges, or immunities secured by the Constitution." "Suit[s] in equity" obviously includes injunctions.[5]

I hold to the view that § 1983 is included in the "expressly authorized" exception to § 2283,[6] a point not raised or considered in the much-discussed *Douglas* v. *City of Jeannette,* 319 U. S. 157. There is no more good reason for allowing a general statute dealing with federalism passed at the end of the 18th century to control another statute also dealing with federalism, passed almost 80 years later, than to conclude that the early concepts of federalism were not changed by the Civil War.

---

[5] We have already held that § 1983 requires no exhaustion of state remedies. *McNeese* v. *Board of Education,* 373 U. S. 668.

[6] In accord with the view are *Honey* v. *Goodman,* 432 F. 2d 333 (CA6), and *Cooper* v. *Hutchinson,* 184 F. 2d 119 (CA3). Opposed are *Goss* v. *Illinois,* 312 F. 2d 257 (CA7), and *Baines* v. *City of Danville,* 337 F. 2d 579 (CA4).

And see Maraist, Federal Injunctive Relief Against State Court Proceedings: The Significance of *Dombrowski,* 48 Tex. L. Rev. 535, 591 *et seq.* (1970).

That was the view of Judge Will in the *Boyle* case, *Landry* v. *Daley*, 288 F. Supp. 200, 223. In speaking of the Civil War Amendments as "a constitutional revolution in the nature of American federalism" he said:

"This revolution, in turn, represents a historical judgment. It emphasizes the overwhelming concern of the Reconstruction Congresses for the protection of the newly won rights of freedmen. By interposing the federal government between the states and their inhabitants, these Congresses sought to avoid the risk of nullification of these rights by the states. With the subsequent passage of the Act of 1871, Congress sought to implement this plan by expanding the federal judicial power. Section 1983 is, therefore, not only an expression of the importance of protecting federal rights from infringement by the states but also, where necessary, the desire to place the national government between the state and its citizens." *Ibid.*

In *Boyle* the statute makes "intimidation" to "commit any criminal offense" an offense. The three-judge court said:

"It . . . makes criminal threats such as the following: (1) threats by dissentient groups to engage in disorderly conduct, threats by residents of a high-crime neighborhood to carry concealed weapons for their own protection, and threats by mothers to block a dangerous state highway to demonstrate the need for increased safety measures. Indeed, the phrase 'commit any criminal offense' is so broad as to include threats to commit misdemeanors punishable by fine only. These evils are not so substantial that the state's interest in prohibiting the threat of them outweighs the public interest in giving legitimate political discussion a wide berth." *Landry* v. *Daley*, 280 F. Supp. 938, 964.

Landry and others brought a class action challenging the constitutional validity of five sections of the Illinois statutes. They alleged arrests under all but two of the challenged sections. Just before trial they abandoned their challenge of two of the five sections. The District Court held one of the remaining sections constitutional and the "mob action" and "intimidation" sections unconstitutional. Appellants have not appealed the determination that the "mob action" section of the Illinois statutes is unconstitutional.

The Court dismisses this case because there is no showing of irreparable injury on what it describes as "flimsy allegations." *Post*, at 81. The Court states: "There is nothing contained in the allegations of the complaint from which one could infer that any one or more of the citizens who brought this suit is in any jeopardy of suffering irreparable injury if the State is left free to prosecute under the intimidation statute in the normal manner." *Ibid.* Landry and his associates, however, allege that appellants are using the intimidation section along with several other sections to harass them, not to prosecute them in the normal manner. They allege that appellants are arresting them without warrants or probable cause, and detaining them on excessive bail. They allege that the arrests are made during peaceful demonstrations and without any expectation of securing valid convictions. In sum, Landry and his group allege that the "intimidation" section is one of several statutes which appellants are using *en masse* as part of a plan to harass them and discourage their exercise of their First Amendment rights. There is thus a lively and existing case or controversy concerning First Amendment rights. And I believe that the federal court acted in our finest tradition when it issued the stay.

As the standards of certainty in statutes containing criminal sanctions are higher than those in statutes containing civil sanctions, so are the standards of certainty touching on freedom of expression higher than those in other areas. *Winters* v. *New York,* 333 U. S. 507, 515–516. "There must be ascertainable standards of guilt. Men of common intelligence cannot be required to guess at the meaning of the enactment. The vagueness may be from uncertainty in regard to persons within the scope of the act . . . or in regard to the applicable tests to ascertain guilt."

Where freedom of expression is at stake these requirements must be more sedulously enforced.

In *Younger* there is a prosecution under an unconstitutional statute and relief is denied. In *Boyle* there is harassment but as yet no prosecution. Allegations of a prosecution or harassment under facially unconstitutional statutes should be sufficient for the exercise of federal equity powers.

*Dombrowski* and 42 U. S. C. § 1983 indicate why in *Boyle* federal intervention against enforcement of the state laws is appropriate. The case of *Younger* is even stronger. There the state statute challenged is the prototype of the one we held unconstitutional in *Brandenburg* v. *Ohio, supra.*

The eternal temptation, of course, has been to arrest the speaker rather than to correct the conditions about which he complains. I see no reason why these appellees should be made to walk the treacherous ground of these statutes. They, like other citizens, need the umbrella of the First Amendment as they study, analyze, discuss, and debate the troubles of these days. When criminal prosecutions can be leveled against them because they express unpopular views, the society of the dialogue is in danger.