**CANAL NATIONAL BANK et al.,**
**Plaintiffs,**

**v.**

**Peter S. MILLS and Edward M. Levi,**
**Defendants.**

**Civ. No. 74-82 SD.**

United States District Court,
D. Maine, S. D.

Dec. 18, 1975.

**250**

Ralph I. Lancaster, Jr., and Gerald M. Amero, Portland, Me., Joseph B. Campbell, Augusta, Me., David N. Fisher, Jr., Edward J. Ashley, and David P. Cluchey, Portland, Me., for plaintiffs.

Robert J. Stolt, Asst. Atty. Gen., Augusta, Me., for amicus curiae, the Maine State Lottery Commission, supporting position of plaintiffs.

Eugene R. Sullivan, Gen. Litigation Section, Civ. Div., Dept. of Justice, Washington, D. C., for defendants.

## OPINION AND ORDER OF THE COURT

GIGNOUX, District Judge.

This is an action brought under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, seeking a declaration that Public Law 90–203, "An Act to prohibit certain banks and savings and loan associations from fostering or participating in gambling activities," 81 Stat. 608 (1967), *codified at* 12 U.S.C. §§ 25a, 339, 1730c, 1829a, 18 U.S.C. § 1306, does not prohibit plaintiffs' proposed activities as "participating banks" in the Maine State Lottery. Plaintiffs are five banking associations located in Maine.[1] Defendants are Peter Mills, United States Attorney for the District of Maine, and the Attorney General of the United States, now Edward H. Levi.[2] Plaintiffs contend that their participation in the Maine State Lottery will not violate Public Law 90–203; defendants assert that the Act makes such participation unlawful. The action is before the Court on cross-motions for summary judgment, each side urging its interpretation of the Act.[3] The Court does not, however, reach the merits, for it is persuaded that, as defendants contend, the action does not present a justiciable case or controversy.

There are no disputed material facts, the parties having submitted the cause on a stipulated record.

### I

Public Law 90–203 was enacted in 1967 in response to the establishment of state lotteries in New York and New Hampshire. The Act prohibits certain activities relating to state lotteries on the part of financial institutions belonging to any of four categories: national banks, state member banks of the Federal Reserve System, state nonmember banks insured by the Federal

---

1. Plaintiffs are two national banks, the Canal National Bank and the Maine National Bank, both of Portland; one state member bank of the Federal Reserve System, the Merrill Trust Co., of Bangor; and two state nonmember banks insured by the Federal Deposit Insurance Corp., the Depositors Trust Co., of Augusta, and the Casco Bank & Trust Co., of Portland. These institutions are subject, respectively, to 12 U.S.C. §§ 25a, 339 and 1829a.

2. Attorney General Levi took office in February 1975, succeeding William B. Saxbe, who was originally named a defendant in this action. Mr. Levi was substituted as a defendant pursuant to Fed.R.Civ.P. 25(d).

3. The Maine State Lottery Commission has filed a brief amicus curiae in support of plaintiffs' position.

Deposit Insurance Corporation, and state savings and loan associations insured by the Federal Savings and Loan Insurance Corporation. As to each category, the operative language of the Act is the same:

(a) A [financial institution] may not—

(1) deal in lottery tickets;

\* \* \* \* \* \*

(c) As used in this section—

(1) The term "deal in" includes making, taking, buying, selling, redeeming, or collecting.

12 U.S.C. §§ 25a, 339, 1730c, 1829a.[4] A final provision of the Act provides a criminal penalty of a fine of not more than $1000 or imprisonment for not more than one year, or both, for knowing violation of the Act. 18 U.S.C. § 1306.

A law establishing a state lottery in Maine was enacted by the Legislature and approved by referendum in November 1973. *See* 8 Me.Rev.Stat.Ann. §§ 351–367 (1975 Supp.). In the spring of 1974 the State Lottery Commission sought the services of local banks as "participating banks" in the administration of the lottery. In brief, the Commission proposed to deliver lottery tickets to the banks for distribution to retailers. The retailers would collect the tickets at the banks and later return to them the net cash proceeds and any unsold tickets. The banks would safeguard the tickets and proceeds and keep records of these transactions. In return the banks would receive a commission of one percent of gross sales and a "float" of approximately three to six days on the net proceeds. The details of the banks' contemplated participation are set out in two booklets circulated by the Commission, Basic Game Bank Operating Procedures (revised June 16, 1975) and Bank Procedures Maine Great Outdoors Instant Lottery (revised June 2, 1975).

The State Lottery Commission sought to assess the possible impact of Public Law 90–203 on such activities on the part of local banks by requesting interpretations of the Act from the appropriate federal regulatory agencies. Accordingly, it wrote to officials of the office of the Comptroller of the Currency, the Federal Deposit Insurance Corporation, and the Federal Reserve Board, the agencies charged with the administration of the federal banking laws as they relate to the plaintiffs in this case.[5] To each agency the Lottery Commission sent a copy of its proposed operating procedures; and from each the Commission received a favorable reply.

John D. Gwin, Deputy Comptroller of the Currency stated:

[I]t is the view of this Office that the proposed utilization of banking facilities by Maine's State Lottery, in which the bank acts, in effect, as an escrow agent, would not be in contravention of federal banking laws.

Fredric H. Karr, an attorney in the Office of General Counsel of the Federal Deposit Insurance Corporation, replied:

[B]ased upon the information provided, it is the opinion of the Legal Division of this Corporation that the services contemplated by the proposed plan do not violate the provisions of Section 20 of the Federal Deposit Insurance Act (12 U.S.C. § 1829a). Accordingly, this Corporation would have no objection to the participation of insured State nonmember banks as safekeeping facilities for the Maine State Lottery.

---

4. As none of the plaintiffs is insured by the Federal Savings and Loan Insurance Corp., § 1730c is not directly involved in this litigation.

5. Each of these agencies is authorized to promulgate regulations regarding the application of Public Law 90–203 to the banks within its jurisdiction, although none has done so to date.

Finally, Chester B. Feldberg, Secretary of the Federal Reserve Board, stated:

Upon examination of the attachment describing the services and in view of your assurances that the services to be performed are essentially identical to those being performed for other State lotteries, particularly the New Jersey and Pennsylvania State lotteries, which services the Board has previously approved, the staff will interpose no objection under 12 U.S.C. § 339 to the performance of such services by State member banks for the Maine State lottery.

The State Lottery Commission also sought Mr. Mills' views on the legality of the banks' participation. Unlike the representatives of the federal regulatory agencies, Mr. Mills declined to give a favorable opinion. On June 25, 1974, he wrote the State Attorney General's office:

I have reviewed the operating procedures, but must tell you, of course, that I cannot undertake the responsibility which resides with the Attorney General of the State of Maine to give advice to the Commission.

A study of [the] Bank Operating Procedures together with the Agent Operating Procedures, and the statutes, Title 12, USC, Sec. 25(a)[25a], etc., may well lead you to conclude that the activities expected of the banks would be within the prohibition against dealing in lottery tickets despite the administrative opinions which appear to be somewhat to the contrary.

Subsequently, Mr. Mills publicly stated that in his view the proposed participation of the banks would violate Public Law 90–203 and that he intended to seek approval from the Department of Justice to bring any participating bank into court. On July 12, 1974 he stated

that it would be difficult for him "to apply a construction of federal law that would justify the banks' participation. It appears to me that there is

no ambiguity in [Public Law 90–203]."

He further stated

that the banks "have put me in the position of having to ask court action." They "have forced me to either bring a complaint or ignore what appears to me to be a violation of federal statutes."

Finally, he

asserted a desire "to keep the option of filing a complaint against one or all banks that have participated as a test case. If participating banks are ultimately determined to be operating outside the law, it will be up to the courts to decide the proper correction."

The Maine press reported several similar public statements by Mr. Mills during the late summer and fall of 1974.

Plaintiff banks were, and remain, "ready and able" to perform the services requested by the Maine State Lottery Commission. Because of the statements made by Mr. Mills, however, they have to date refused to participate in the lottery. On July 23, 1974, they filed this action for declaratory relief.

Public statements suggesting that activities connected with state lotteries may violate various federal anti-lottery statutes were made during the fall of 1974 by William B. Saxbe, then Attorney General of the United States. On August 30, 1974, Mr. Saxbe invited officials of 13 states operating lotteries to meet with him in Washington to discuss possible violations of federal law. On September 6, the day of that meeting, the Justice Department issued a press release listing federal statutes "which are apparently being violated by some of [sic] all of the State-operated lotteries" and proposing remedial measures. The release indicated that the Department intended to press for remedial legislation. It stated:

[T]he Criminal Division has recognized that strict enforcement of the gambling statutes by Federal author-

ities would have the effect of imposing an anti-lottery policy upon certain states which, through their respective legislatures, have determined that state conducted lotteries are in the public interest. . . .

\*     \*     \*     \*     \*     \*

The Department's position is [to support] legislation [which] would permit the expansion of a legal state lottery to the fullest extent consistent with the lottery laws of her sister states. At the same time it would protect and uphold the laws of those states which have determined that lotteries are not in the best interest of its [sic] citizens.

At the meeting with state officials Attorney General Saxbe stated his intention not to put any state lottery "out of business" and his hope that "through [a] give-and-take process we can reach an understanding of the scope of the [conflict between state lotteries and federal anti-lottery statutes] and how best to handle it." At a press conference following this meeting Mr. Saxbe stated his intention to press for early passage of remedial legislation, but, if that failed, to file actions "to seek injunctive relief."

Legislation along the lines proposed in the press release of September 6, 1974 was supported by the Justice Department and enacted by Congress on January 2, 1975. Public Law 93–583, 88 Stat. 1916 (1975), *codified at* 18 U.S.C. §§ 1953(b)(4), 1307, 39 U.S.C. § 3005(d). At no stage of its development, however, neither as proposed by the Justice Department nor as considered and passed by Congress, did this legislation address itself to amending or clarifying Public Law 90–203, the Act that is the subject of this lawsuit. The Department had not overlooked Public Law 90–203. The release of September 6 noted Mr. Mills' views on its applicability to bank participation in state lotteries and included Public Law 90–203, along with statutes directed to other lottery-connected activities such as the use of the mails, advertising and interstate transportation of gambling paraphernalia, in the list of "apparent violations" of federal law. At the foot of that list, however, the release stated:

The legislative history of the banking statutes [12 U.S.C. §§ 25a, 339, 1730c and 1829a] indicates that the Congress intended to specifically permit the regulated banks to engage in in "record keeping activities and to perform other custodial functions on behalf of the state lotteries." It is further indicated the banks should "be permitted to distribute lottery tickets to duly authorized sale agents of the state" and make payments to winners. The intent of the statutes appears to be the prohibition of the sale and advertising of lottery tickets by banks.

Thus, in the September 6, 1974 press release, the Department of Justice indicated that in its view the banking laws at issue in the present case would not be violated by bank participation of the nature contemplated by the Maine State Lottery and that remedial legislation clarifying or amending Public Law 90–203 was unnecessary.

There is no evidence that the Department has changed its position with respect to Public Law 90–203. Plaintiffs have presented no subsequent public statements by Attorney General Saxbe suggesting an intent to prosecute participating banks, and the present Attorney General, Edward H. Levi, has made no public statements on the matter.

Mr. Mills, on the other hand, has adhered to his view that participation would be unlawful, and he has sought permission from the Department of Justice to prosecute those Maine banks which have chosen to go ahead and participate in the lottery. Such permission has not been forthcoming, however, and Mr. Mills stated at oral argument of the present motions that he has been directed to take no action with regard to this matter without first clearing it with Washington. Nor has any prosecution been initiated against banks in other

states which are participating in other state lotteries under procedures substantially similar to those in effect in the State of Maine.

Although in his reply brief in the present action defendants' counsel argues that Public Law 90–203 prohibits bank participation in the Maine State Lottery, defendants have refused to stipulate that this is the view of the Department of Justice; and at oral argument of the present motions, defendants' counsel refused to say one way or the other whether the Department was of that view or whether the Department would authorize prosecution by Mr. Mills. Defendants' counsel did, however, acknowledge that the Lottery Commission's receipt of favorable opinions from the federal agencies charged with the administration of the banking laws would appear to place a major obstacle in the path of a prosecution attempt to prove that a participating bank "knowingly violated" the law. 18 U.S.C. § 1306.

## II

■ It is a matter of first principles that the federal courts will not render "advisory opinions" in any action which does not present a "case or controversy" within the meaning of Article III of the United States Constitution. See, e. g., United Public Workers of America v. Mitchell, 330 U.S. 75, 89, 67 S.Ct. 556, 91 L.Ed. 754 (1947); Muskrat v. United States, 219 U.S. 346, 31 S.Ct. 250, 55 L.Ed. 246 (1911); Hayburn's Case, 2 Dall. 409, 2 U.S. 409, 1 L.Ed. 436 (1972). This requirement has been explicitly recognized in the Declaratory Judgment Act, which authorizes the federal courts to render declaratory relief only "[i]n a case of actual controversy within its jurisdiction." 28 U.S.C. § 2201. See Aetna Life Insurance Co. v. Haworth, 300 U.S. 227, 239–40, 57 S.Ct. 461, 81 L.Ed. 617 (1937). At the threshold, therefore, this Court must determine whether this action presents an "actual controversy" justiciable under Article III and the Declaratory Judgment Act.

For if there is no justiciable controversy, this Court's view as to the applicability of Public Law 90–203 to plaintiffs' participation in the Maine State Lottery would amount to an advisory opinion that it is powerless to render. United Public Workers of America v. Mitchell, supra; International Longshoremen's and Warehousemen's Union v. Boyd, 347 U.S. 222, 74 S.Ct. 447, 98 L.Ed. 650 (1954).

■ The existence of an actual controversy cannot be determined by reference to any "bright line" test:

The difference between an abstract question and a "controversy" contemplated by the Declaratory Judgment Act is necessarily one of degree, and it would be difficult, if it would be possible, to fashion a precise test for there is such a controversy. Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between determining in every case whether parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

Maryland Casualty Co. v. Pacific Coal & Oil Co., 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941). See Regional Rail Reorganization Act Cases, 419 U.S. 102, 143 n. 29, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974).

■ In actions seeking declaratory or injunctive relief against possible future enforcement of state or federal laws, the Supreme Court has repeatedly insisted that an "actual controversy" is not presented unless there is a real, not a hypothetical or speculative, likelihood of enforcement. Thus, in United Public Workers of America v. Mitchell, supra, the Court refused to consider challenges to the constitutionality of the Hatch Act brought by federal employees who wished to engage in political activities but had so far refrained from doing so. The

Court stated, 330 U.S. at 89–91, 67 S.Ct. 564, 565 (footnote omitted):

> The power of courts, and ultimately of this Court, to pass upon the constitutionality of acts of Congress arises only when the interests of litigants require the use of this judicial authority for their protection against actual interference. A hypothetical threat is not enough. We can only speculate as to the kinds of political activity the [employees] desire to engage in or as to the contents of their proposed public statements or the circumstances of their publication. It would not accord with judicial responsibility to adjudge, in a matter involving constitutionality, between the freedom of the individual and the requirements of public order except when definite rights appear upon the one side and definite prejudicial interferences upon the other.

> The Constitution allots the nation's judicial power to the federal courts. Unless these courts respect the limits of that unique authority, they intrude upon powers vested in the legislative or executive branches. Judicial adherence to the doctrine of the separation of powers preserves the courts for the decision of issues, between litigants, capable of effective determination. . . . No threat of interference by the Commission with rights of these appellants appears beyond that implied by the existence of the law and the regulations. . . . We should not take judicial cognizance of the situation presented on the part of [these employees].

The Supreme Court has used similar language in a series of recent decisions considering actions for declaratory or injunctive relief against enforcement of federal and state statutes. *See Ellis v. Dyson,* 421 U.S. 426, 434–35, 95 S.Ct. 1691, 44 L.Ed.2d 274 (1975); *Steffel v. Thompson,* 415 U.S. 452, 458–60, 94 S. Ct. 1209, 39 L.Ed.2d 505 (1974); *O'Shea v. Littleton,* 414 U.S. 488, 493–99, 94 S. Ct. 669, 38 L.Ed.2d 661 (1974); *Young-er v. Harris,* 401 U.S. 37, 41–42, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971); *Golden v. Zwickler,* 394 U.S. 103, 108–10, 89 S.Ct. 956, 22 L.Ed.2d 113 (1969); *Poe v. Ullman,* 367 U.S. 497, 501, 81 S.Ct. 1752, 6 L.Ed.2d 989 (1961); *International Longshoremen's and Warehousemen's Union v. Boyd, supra. See also Rodos v. Michaelson,* 527 F.2d 582 (1st Cir. Nov. 26, 1975); *Rincon Band of Mission Indians v. County of San Diego,* 495 F. 2d 1, 3–8 (9th Cir.), *cert. denied,* 419 U.S. 1008, 1022, 95 S.Ct. 328, 42 L.Ed.2d 283 (1974). These decisions have made it clear that the federal courts may not entertain petitions for declaratory relief by plaintiffs whose fear of prosecution under the challenged law is "imaginary or speculative." *Younger v. Harris, supra* 401 U.S. at 42, 91 S.Ct. 746. "The injury or threat of injury must be both 'real and immediate,' not 'conjectural' or 'hypothetical.'" *O'Shea v. Littleton, supra* 414 U.S. at 494, 94 S.Ct. at 675. A "genuine threat" of prosecution must be demonstrated. *Ellis v. Dyson, supra* 421 U.S. at 434, 95 S.Ct. 1691. Moreover, the "credible threat" of prosecution must be shown to exist as of the time of decision, not merely at the time the complaint was filed. *Ellis v. Dyson, supra* at 435, 95 S.Ct. 1691; *Steffel v. Thompson, supra* 415 U.S. at 459 & n. 10, 94 S.Ct. 1209; *Golden v. Zwickler, supra.*

Under all the circumstances of the present case, it is most unlikely that these plaintiffs would be prosecuted under Public Law 90–203 if they were to participate in the Maine State Lottery. Other Maine banks and banks in other states, all subject to the provisions of Public Law 90–203, have for some time been rendering services to state lotteries substantially identical to those contemplated by plaintiffs in this action. None of these other banks has been prosecuted. Any such prosecution would fly in the face of the opinions rendered by the regulatory agencies charged with the administration of the federal banking laws. Although Mr. Mills has continued to state that bank participation

in the Maine State Lottery would be unlawful and although he continues to seek permission from the Department of Justice to prosecute participating banks, to date the Department has withheld permission.

The evidence indicates that permission to prosecute participating banks will not be forthcoming. The Department's press release of September 6, 1974 expressed the view that bank participation would very likely not violate Public Law 90–203. Neither Attorney General Saxbe nor Attorney General Levi has expressed an intent to prosecute participating banks; rather, Mr. Saxbe's public remarks indicate that if the Department should in the future conclude that Public Law 90–203 does prohibit bank participation, the Department would seek either remedial legislation or voluntary compliance with the Act, in preference to criminal prosecution. Defendants have refused to stipulate that the Department of Justice takes the view that Public Law 90–203 prohibits bank participation in the Maine State Lottery, and defendants' counsel at oral argument would not express any opinion either as to the Department's interpretation of the Act or as to the likelihood of prosecution. Moreover, government counsel have conceded that the favorable opinions of the federal agencies responsible for administration of the Act would make it difficult for the government to establish that a participating bank "knowingly violated" the law, as required for a conviction under 18 U.S.C. § 1306. In light of these central facts relating to the likelihood of prosecution in this case, the threats of prosecution by Mr. Mills must be substantially discounted.

For these reasons, the Court concludes that plaintiffs have failed to establish the realistic threat of prosecution which must be shown if an "actual controversy" justiciable under Article III of the Constitution and the Declaratory Judgment Act may be said to exist. Accordingly, plaintiffs' motion for summary judgment is denied; defendants' motion for summary judgment is granted; and judgment will be entered dismissing the action.

It is so ordered.