**Edwin H. HELFANT, Appellant,**

**v.**

**George F. KUGLER, Attorney General of the State of New Jersey, et al., Appellees.**

**No. 73–1386.**

United States Court of Appeals, Third Circuit.

Argued Sept. 7, 1973.

Decided Sept. 10, 1973.

Rehearing En Banc Granted Jan. 11, 1974.

Marvin D. Perskie, Perskie & Callinan, Wildwood, N. J., Patrick T. McGahn, Jr., Atlantic City, N. J., for appellant.

Edward C. Laird, State of N. J., Dept. of Law & Public Safety, Division of Law, George F. Kugler, Jr., Atty. Gen. of N. J., Trenton, N. J., for appellees.

Before STALEY, ADAMS and GIBBONS, Circuit Judges.

## OPINION OF THE COURT

PER CURIAM.

This is an appeal from an order of the district court which (1) denied plaintiff's motion for a preliminary injunction prohibiting the Attorney General of New Jersey and others from proceeding with the prosecution of an indictment pending in that state, and (2) granted the defendants' motion to dismiss the complaint for failure to state a claim upon which relief could be granted. The district court held an evidentiary hearing on the motion for a preliminary injunction, but in view of its ruling on the defendants' motion made no findings of fact.

The plaintiff-appellant Helfant is a member of the New Jersey bar and a former municipal court judge of that state. His verified complaint alleges:

"4. Some time before October 18, 1972 the State of New Jersey began a State Grand Jury Investigation, inter alia, into an alleged illegal withdrawal of an indictable criminal charge of atrocious assault and battery arising out of an incident occurring on March 17, 1968 in Egg Harbor City, Atlantic County, New Jersey, in which the [plaintiff] was alleged to have participated. This State Grand Jury investigation was personally conducted by the defendant, Joseph A. Hayden, Jr., Deputy Attorney General of the State of New Jersey.

5. The plaintiff, Edwin H. Helfant, was a designated target of the State Grand Jury investigation and was so advised by the Deputy Attorney General aforedesignated, who was handling the matter, when he first appeared before the State Grand Jury on October 18, 1972 at which time he resorted to his privilege under the Fifth Amendment of the United States Constitution and refused to testify.

6. He was subsequently subpoenaed to appear again before the State Grand Jury on November 8, 1972. The State Grand Jury at that time sat at the State House Annex, Trenton, New Jersey at the other end of the hall from the private chambers of the Chief Justice and Justices of the New Jersey Supreme Court.

7. On November 6, the Administrative Director of the Courts of New Jersey called the law offices of the plaintiff in Atlantic City, New Jersey. About 3:30 in the afternoon, after being given the message of this call, plaintiff returned the call to the Administrative Director. He was directed by the Administrative Director to appear before the Supreme Court in their private chambers at 10 minutes before 10 on November 8, 1972. The plaintiff advised the Administrative Director that at 10 o'clock he had to appear before the Grand Jury. The Administrative Director advised the plaintiff that the Supreme Court was well aware of this fact and that he was still to be before the Supreme Court. No reason was given

for this appearance and no other direction to appear, other than the telephone message of the Administrative Director made to the plaintiff directly, and to his office. At or about the designated time on November 8, 1972 the plaintiff went into the chambers of the Supreme Court at the State House, Trenton, New Jersey. He was questioned by the Chief Justice and Associate Justice Sullivan in the presence of the Court. The Chief Justice inquired of the defendant whether he thought a Judge should invoke the Fifth Amendment. Justice Sullivan asked what the plaintiff's feelings were about a Judge sitting in judgment of other people while he himself was invoking the Fifth Amendment before a Grand Jury. He also asked plaintiff if he had sat as a Judge since invoking the Fifth Amendment. Chief Justice Weintraub and another Justice also asked of plaintiff some questions about his son's Bar Mitzvah, which matters were contemporaneously being considered by the State Grand Jury, including seating arrangements and who paid for the liquor. These questions also concerned an Abe Schusterman, who was a State's witness against the plaintiff and who had appeared before the State Grand Jury. The Chief Justice also questioned plaintiff about Atlantic County Judge Thomas Rauffenbart and about an ice-making machine that was involved in an alleged pay-off in a criminal case involving Abe Schusterman, all of which matters were then being considered and investigated by the State Grand Jury which was being conducted by the defendant Joseph A. Hayden, Jr. under the direction of Attorney General George F. Kugler.

The questions posed to the plaintiff by the Justices of the Supreme Court were in connection with matters then being considered by the State Grand Jury. There had been no public release of these matters, particularly the Bar Mitzvah, seating arrangements thereat, arrangements for the liquor and the gift of an ice machine. These matters had to be a portion of the raw evidence then being considered by the State Grand Jury and released and given to the Supreme Court during the pendency of the Grand Jury proceedings by defendant Deputy Attorney General Joseph A. Hayden, Jr., who was conducting the Grand Jury investigation.

After the plaintiff left the Supreme Court chambers, he was in a state of confusion and bewilderment and had to go immediately before the State Grand Jury. On a previous occasion before the State Grand Jury he had encountered three State's witnesses who were then in State and County Prisons serving sentences for various crimes, two of said witnesses having long records. He had been advised by Detective William Sullivan of the New Jersey State Police, who was assisting Deputy Attorney General Hayden in the investigation, of the thrust of some of the testimony of these witnesses, which testimony if believed would incriminate the plaintiff. He was therefore in a position that if he testified at variance with these witnesses, even though it were the truth, the State Grand Jury would be faced with inconsistent statements and could indict him for false swearing, as he was. He was faced with the proposition that if he agreed with the testimony of these witnesses, he could be indicted for conspiracy, as he was. Knowing of these witnesses, i. e., John Cantoni, Shelly Kravitz and Abe Schusterman, their reputations and backgrounds and long records of convictions, plaintiff was aware that they had to have testified as a result of promises and commitments made to them in connection with shortening their prison stays, which facts were later admitted by the Deputy Attorney General Joseph A. Hayden, Jr. in connection with answers made to discovery wherein he admitted that recommendations of leniency and dropping of charges had been made in the cases of all three men.

8. As a result of these questions, the plaintiff, whose previous counsel-advised intentions and will were completely discarded and overcome and who was quite emotionally upset by the confrontation, indicated to the Justices that he would

indeed waive his Fifth Amendment privilege and testify in full before the State Grand Jury, fearing not only the loss of his Judgeship, but his accreditation as a member of the bar as well.

9. Immediately after the plaintiff left the chambers of the New Jersey Supreme Court, Deputy Attorney General Joseph A. Hayden, Jr., who was then conducting the State Grand Jury investigation of which plaintiff was a target, went into the Supreme Court chambers and stayed there for a short period of time and then left. It is believed he preceded the plaintiff into the chambers and that he had previous contact about plaintiff with the Supreme Court about the pending investigation."

The complaint also alleges:

"14. As a result of the intrusion by the Deputy Attorney General and the disclosure to the Supreme Court of factual matters involved in a Grand Jury investigation during pendency of that investigation, and because of the intrusion of the New Jersey Supreme Court into the Grand Jury investigation and the communication between the Supreme Court of New Jersey and the Deputy Attorney General conducting the Grand Jury investigation, the plaintiff herein is made to suffer great, immediate, substantial and irreparable harm in that he must attempt to defend criminal charges brought in a State in which there has been prejudicial collusion directly affecting plaintiff, whether intentional or inadvertent between the Judicial and Executive branches of the New Jersey State government. Plaintiff is being made to defend criminal charges which have been obtained, inter alia, as a result of that collusion, and the deprivation of plaintiff's constitutional rights by not too subtle cooperative coercion on the part of the defendants. Furthermore, in the event of his conviction upon any one of the charges presently pending against him, plaintiff's only recourse would be review by the State Courts and ultimately the New Jersey Supreme Court, which

Court he has alleged has been involved in the prosecution of the charges against him."

Insofar as this appeal reviews the order dismissing Helfant's appeal for failure to state a claim upon which relief may be granted these factual allegations must be taken as true.

The opposing affidavits filed by the state defendants in opposition to Helfant's motion for a preliminary injunction do not dispute any of the historical factual allegations of the Complaint quoted above, except that defendant Hayden avers:

"I had no knowledge that Helfant was to appear before the New Jersey Supreme Court until I was called by the Supreme Court on November 6, 1972 and told that Helfant might be a few minutes late for his grand jury appearance."

Read in the light most favorable to those defendants, the affidavits do tend to suggest that Helfant's testimony before the grand jury was the result of a voluntary waiver of his privilege against self incrimination rather than of any compulsion by the Supreme Court. It is fair to say that for purposes of the motion for a preliminary injunction, whether Helfant's testimony was the result of compulsion was put in issue and that this issue could be resolved only by an evidentiary hearing.

At the evidentiary hearing Helfant presented the testimony of Patrick T. McGahn, one of his attorneys, and testified himself. On the disputed issue of compulsion to testify before the grand jury this testimony by Helfant is relevant:

"Q. Now you went to Trenton on November the 8th in the company of your two attorneys?

A. Both you and Mr. McGahn.

Q. What was your intention with regard to appearing and testifying before the State Grand Jury on that date before you arrived at Trenton?

A. Well actually I had no intention, Mr. Perskie, because Mr. Sullivan had

said something about immunity and I had already invoked the Fifth Amendment and I didn't intend to testify about anything. I asked you in the car what are they going to give me immunity for?

Q. When you arrived at Trenton, you went to the Clerk's Office of the Supreme Court, did you not?

A. Yes.

Q. And you were subsequently ushered into the Supreme Court private Chambers?

A. Well, it was scheduled for 9:50 and if you will remember Mr. Perskie, it was raining something awful and the Supreme Court was a little late; and about 9:55 Mrs. Pesco took me from her office to the Supreme Court Chambers or conference room, not the Chambers.

Q. Conference Room. Do you know how many Judges were there?

A. To my knowledge one judge, I think Justice Proctor was missing, I am not sure, but I think, that Justice Proctor was missing.

Q. Were they sitting in their robes?

A. Yes, sir, I think they were; yes, sir.

Q. Now what happened when you came in?

A. I walked in and without any good mornings or anything else, the Chief Justice asked me if I thought it right for a Judge to invoke the Fifth Amendment.

Q. Now were they sitting down, the Judges?

A. Yes, they were seated.

Q. Were you standing or——

A. Mr. Perskie, I don't remember if they told me to be seated or if I was standing up.

Q. And what was your state of mind and your feelings as you entered those Chambers?

A. Well Mr. Perskie, I couldn't understand why they wanted me on such short notice, five minutes or ten minutes before the Grand Jury hearing and I was scared.

Q. Now you said the Chief Justice said something to you. Relate the conversation that took place as nearly as you can?

A. The Chief Justice asked me if I thought it right for a Judge to invoke the Fifth Amendment? And I said, Mr. Chief, before I can answer that I'd like to explain. He said, I don't want to get into the merits. I just want you to answer the question. And I said, well the answer to your question is no, I don't think it right; but I said, I would like to explain; and he said, no explanation is necessary.

Q. Was there any other conversation?

A. Mr. Justice Sullivan, who had just been appointed and I recognized him, I never met Justice Sullivan before; asked me if I had sat in the Municipal Court since I had invoked the Fifth Amendment; and I told him I had sat once in Somers Point; and he then asked, do I think it right to sit in judgment of other people when I myself had invoked the Fifth Amendment and refused to answer certain questions that were posed to me.

Q. What did you respond?

A. I then tried to tell Justice Sullivan about the three convicts and the reports that I had had of what they were saying and I felt that the only way I could protect myself, and the Chief Justice then said, we do not want to get into the merits; and I was cut off from saying any more. The Chief Justice then began to ask me about an ice maker that I was suppose to have purchased for Judge Rauffenbart and I told him I had purchased one and I had a receipt for it and cancelled check; and he then began to inquire about this fellow Schusterman and was Schusterman at my son's Bar Mitzvah and I tried to explain how he happened to be there, that he supplied the novelities and the

favors. The Chief Justice asked me about the seating arrangements for the Bar Mitzvah and then he asked me who had purchased the liquor for the Bar Mitzvah, whether Mrs. Schusterman was there and whether I had purchased any other gifts for Judge Rauffenbart. He asked if formal invitations were sent out. It was basically things pertaining to Abe Schusterman who I had known had testified on the 25th of October, one week before.

Q. Now was there any file in the presence of the Chief Justice?

A. There was a file in front of the Chief Justice, Mr. Perskie, but it was closed and it was with the same brown folder that was submitted to you by Mr. Hayden in your request with the clasp on the top of it. I don't absolutely recall Mr. Perskie, everything that went on in front of the Supreme Court.

Q. How long would you say you were totally, the total time you were before the Court?

A. It wasn't longer than ten or twelve minutes, Mr. Perskie.

Q. And when you came out——

A. Well, there was one other question the Chief asked me and I think it was the tone, when he said, what do you intend to do today?

Q. And what did you tell him?

A. I said, Mr. Chief Justice, I am going to testify."

■■ The district court denied preliminary relief and dismissed the complaint on the ground that Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L. Ed.2d 669 (1971) precluded federal intervention. In the posture in which the case is before us, the district court has ruled only on the legal sufficiency of the complaint, and has not made any findings of fact. Whether or not Helfant's testimony before the grand jury was voluntary or coerced is a crucial fact issue. Although no testimony was offered by the state defendants, on that crucial fact issue the district court, had it made factual findings, might have found Helfant's testimony not credible, and might on this ground have declined to issue a preliminary injunction. But for purposes of a motion to dismiss pursuant to Rule 12(b)(6) that possibility is irrelevant. In reviewing the order granting that motion we must take as true Helfant's contention that he was coerced by the Supreme Court of New Jersey into testifying before the grand jury and that he is about to be tried on an indictment resulting from that coerced testimony. The record establishes that a trial court has declined to quash the indictment and that attempts to obtain interlocutory appellate relief in the New Jersey courts have been unavailing. Even if at a later stage a New Jersey trial court were to quash the indictment the state could appeal that decision to the Supreme Court of New Jersey. *See, e. g.,* State v. Winne, 12 N.J. 152, 96 A. 2d 63 (1953).

■ Younger v. Harris, *supra,* holds that a federal court should not enjoin a pending state prosecution in the absence of a showing of bad faith, harassment or " . . . [other] extraordinary circumstances in which the necessary irreparable injury can be shown even in the absence of the usual prerequisites of bad faith and harassment." Younger v. Harris, *supra,* 401 U.S. 53, 91 S.Ct. 755. *See* Lewis v. Kugler, 446 F.2d 1343 (3d Cir. 1971); Conover v. Montemuro, 477 F.2d 1073, 1080 (3d Cir. 1973). Neither the Supreme Court nor this court has considered what extraordinary circumstances will justify federal intervention in a pending state prosecution. But the Younger v. Harris line of cases is predicated upon the fundamental assumption that defense of the pending state prosecution affords an adequate remedy at law for the vindication of the federal constitutional right at issue. Exceptional circumstances, then, must include circumstances reflecting upon the likelihood that the state forum will afford an adequate remedy at law. If the circumstances here alleged do not fall within

that category it would be difficult to imagine any that would. If it is true that Helfant is being tried on an indictment which resulted from his testimony before the grand jury coerced from him by the Supreme Court of New Jersey, his fifth amendment privilege against self incrimination has already been violated, and the effect of that violation is, by virtue of the ongoing prosecution, continuing. Since the Supreme Court of New Jersey is accused of having exercised the coercion, a remedy in the courts of New Jersey, and ultimately in that Court, hardly seems adequate.

We hold, then, that Younger v. Harris, *supra*, did not require the dismissal of the complaint. That holding requires a reversal and remand.

The order denying the preliminary injunction is also predicated upon Younger v. Harris, *supra*. We did not hear the testimony of Mr. McGahn and Mr. Helfant, and we cannot judge the credibility of Helfant's testimony that he was coerced. At the same time, on the record before us his testimony is not contradicted except by affidavits, and those affiants have not been cross examined. The record is sufficient to suggest that the status quo be preserved until such time as the district court can make findings of fact. Mindful that present or even potential interference with a pending state prosecution is a matter of utmost gravity, this case should on remand receive accelerated consideration, and the court should enter an order consolidating the hearing on the motion for a preliminary injunction with a trial on the merits. Rule 65(a)(2) Fed.R.Civ.Proc.

At the oral argument on this appeal we asked the attorney for the appellees if the State intended to commence the trial of the indictment, now scheduled for September 10, 1973, while this appeal was *sub judice*. We were advised that this was the State's intention. Accordingly we issued an order enjoining commencement of the prosecution until such time as we could decide the appeal.

The order dismissing the complaint will be reversed. The order denying the motion for a preliminary injunction will be vacated, and the case will be remanded to the district court for the entry of an order temporarily enjoining the trial of Indictment No. SCJ 10–72–10 until final hearing, and for the entry of an order consolidating hearing on the motion for a preliminary injunction with trial on the merits. We direct that that trial be commenced forthwith, and that the district court shall make findings of fact and conclusions of law within thirty days from the date of the mandate of this court. The mandate of this court shall issue forthwith.

ADAMS, Circuit Judge (concurring):

I concur in the result reached by the majority in this matter. Although the doctrine of Younger v. Harris generally precludes a federal district court from enjoining a criminal proceeding already under way in the state court, there are limited exceptions to this wise rule of comity. One of those exceptions, as I read *Younger*, arises when "extraordinary circumstances" or "unusual circumstances," 401 U.S., at 53 and 54, 91 S.Ct. 746, exist. As the recitation set forth in the majority opinion demonstrates, it would seem to me that such extraordinary or unusual circumstances are asserted here so as to make it appropriate for the district court to proceed with findings of fact and conclusions of law.

The plaintiff claims, both in his pleadings and in his evidence, that he was coerced by members of the State Supreme Court into relinquishing his Fifth Amendment right not to testify before the grand jury. He asserts that he then did testify, and that, as a result, he was indicted because of his allegedly coerced testimony. He sought, in the state court, to have the indictment dismissed because it was based on the coerced testimony, but his motion was refused, and the state appellate courts declined to entertain his appeal.

If the district court should determine, after an appropriate evidentiary inquiry,

that this plaintiff's Fifth Amendment right *has* been abridged, in the factual setting of this case an exception to Younger's precept of non-interference would obtain.[1]

1. Although the plaintiff names as defendants the Justices of the Supreme Court of New Jersey as well as that State's Attorney General, the final injunction, if issued, may be limited to the Attorney General, prohibiting him from continuing criminal proceedings against plaintiff. It should also be noted that plaintiff does not seek money damages.