PAMELA NORCISA *vs.* BOARD OF SELECTMEN OF PROVINCETOWN & another.[1]

Barnstable.    February 7, 1975. — June 19, 1975.

Present: TAURO, C.J., REARDON, QUIRICO, HENNESSEY, & WILKINS, JJ.

*Equity Jurisdiction*, Criminal prosecution, Declaratory relief.

Discussion of injunctions against and declaratory relief with respect to criminal proceedings.    [166-173]

A court of equity had no jurisdiction to restrain a board of selectmen from pursuing a pending criminal action for alleged violation of G. L. c. 101, §§ 6, 8, against one who, had the action been permitted to continue, would not have been threatened with any injury other than that incidental to every criminal proceeding brought lawfully and in good faith, nor did the court have jurisdiction to give declaratory relief with respect to such action.    [170-173]

BILL IN EQUITY filed in the Probate Court for the county of Barnstable on December 27, 1973.

The suit was heard by *Knight*, J., on a statement of agreed facts.

[1] Fernando Gonsalves, described as agent for the board of selectmen.

After review was sought in the Appeals Court, the Supreme Judicial Court, on its own initiative, ordered direct appellate review.

*Charles L. Field* for the defendants.

*Maurice M. Goldman*, for the plaintiff, submitted a brief.

*Walter H. Mayo, III*, Assistant Attorney General, & *John Hurley*, Legal Assistant to the Attorney General, for the Attorney General, submitted a memorandum.

QUIRICO, J.　This is an appeal by the defendants, the board of selectmen of Provincetown (selectmen) and their agent, from a decree entered by the judge of the Probate Court for Barnstable County, apparently acting under G. L. c. 231A, §§ 1, 2, and under G. L. c. 215, § 6, as appearing in St. 1963, c. 820, § 1, declaring that the plaintiff and her retail clothing business in the town of Provincetown (town) are not within the scope of G. L. c. 101, §§ 1-12, the Transient Vendor Statute, and ordering that the town and its agents, servants, and employees "are hereby restrained and permanently enjoined from enforcing . . . any of the provisions of Mass. G. L. c. 101, §§ 1-12, against the Petitioner or the retail business she operates." This appeal was first entered in the Appeals Court and we then transferred it to this court, acting on our own motion. G. L. c. 211A, § 10 (A), inserted by St. 1972, c. 740, § 1. Prior to the commencement of this suit in equity, a criminal complaint had issued in the Second District Court of Barnstable County charging the plaintiff with violating G. L. c. 101, §§ 6, 8. This criminal complaint was still pending when the decree appealed from issued. The obvious purpose and effect of the decree was to enjoin the pending criminal prosecution.[2]　We reverse.

---

[2] Indeed, the final decree issued by the judge was preceded by a preliminary injunction whose only command was that the defendants "desist and refrain from bringing or attempting to bring criminal action against your petitioner under the power of M. G. L. Ch. 101

The facts apparently relied on by the judge in issuing the final decree were contained in a document signed by attorneys for both the plaintiff and the defendants, entitled "Agreed Statement of Facts." It appears from this document that sometime late in 1973 the plaintiff, who was a resident of Provincetown, opened a retail clothing business in that town under the name of The Town Crier Wearhouse. At the time she opened her business, the plaintiff was informed by the agent for the selectmen "that she would not be able to open and operate her business unless she paid to Provincetown a license fee of two hundred dollars ($200.00), furnished a bond of five hundred dollars ($500.00), to the Commonwealth, and applied for both a state and town Transient Vendor's License, all of the above pursuant to and authorized by G. L. c. 101, § 3." [3]

General Laws c. 101, § 3,[4] requires that anyone "before commencing business in the commonwealth as a

---

relative to your petitioner's operation of a retail store for the sale of clothing in said Town of Provincetown."

[3] It would appear that the attempt to require the plaintiff to obtain a town license was actually made pursuant to G. L. c. 101, § 5, not § 3. In view of our decision hereafter, it is of no consequence which statute underlay the town's position.

[4] General Laws c. 101, § 3, as amended through St. 1972, c. 684, § 16, provides as follows: "Every person before commencing business in the commonwealth as a transient vendor, whether as principal or agent, shall make written application, under oath, for a state license to the director stating the names and residences of the owners or parties in whose interest said business is to be conducted, and shall make a special deposit of five hundred dollars with the director or shall give a bond in the sum of five hundred dollars, payable to the director and his successors, with sureties approved by the director, conditioned upon (1) compliance with the provisions of this chapter relative to transient vendors, (2) payment of all fines or penalties incurred by him through violations of such provisions, and (3) payment or satisfaction of any judgment obtained against him in behalf of any creditor whose claim arises in connection with the business done under the licensee's state license and who, before the expiration of sixty days from the return or surrender of said license or the filing

transient vendor" shall apply for a State license, good for one year, to do business as a transient vendor, subject to local rules and regulations. With the license application, the applicant must deposit $500 or give a bond in that sum, "conditioned upon (1) compliance with the provisions of this chapter relative to transient vendors, (2) payment of all fines or penalties incurred by him through violations of such provisions, and (3) payment or satisfaction of any judgment obtained against him in behalf of any creditor whose claim arises in connection with the business done under the licensee's state license and who . . . shall have given due notice of his claim to the director [of standards in the executive office of consumer affairs]." A "transient vendor" is defined as "any person, either principal or agent, who engages in a temporary or transient business in the commonwealth selling goods, wares or merchandise, either in one locality or in traveling from place to place." G. L. c. 101, § 1. "Temporary or transient business" is further defined as "any exhibition and sale of goods, wares or merchandise which is carried on in any tent, booth, building or other structure, unless such place is open for business during usual business hours for a period of at least twelve consecutive months." G. L. c. 101, § 1.

---

of an affidavit of its loss, shall have given due notice of his claim to the director. Thereupon, upon the payment of a fee of thirty dollars, the director shall issue to him a state license authorizing him to do business as a transient vendor, subject to such local rules and regulations as may be made in a city by the mayor and city council and in a town by the selectmen. Such license shall expire one year from the date thereof or on the day of its surrender or of the filing of an affidavit of its loss, if it is earlier surrendered or if such affidavit is earlier filed. Such license shall contain a copy of the application therefor and of any statements required under section seven, and shall not be transferable. It shall not authorize more than one person to sell goods, wares or merchandise as a transient vendor either by agent or clerk or in any other way than in his own proper person, but a licensee may have the assistance of one or more persons in conducting his business who may aid him but not act for or without him."

The plaintiff's position as stated in the "Agreed State-
ment of Facts" is that she was not a transient vendor at
the time the selectmen sought to categorize her as one,
that she had not been a transient vendor in the past, and
that she would not be a transient vendor in the future.
She further asserted that she had performed no acts
which could be construed as classifying her as anything
except a retailer of clothes, that she intended to conduct
her business as a full time retail clothing shop, and that
she would take no action inconsistent with these asser-
tions. The plaintiff further claimed that the selectmen
refused "to hold an examination or hearing to determine
the relevant and material facts." The defendants' posi-
tion, in the court below as well as in their brief here, has
been "that under the terms of the statute petitioner is
required to take out a transient vendor's license unless she
*has been* 'open for business during usual business hours
for a period of at least twelve consecutive months'"
(emphasis added).[5]

The briefs of both parties are replete with assertions
and counterassertions regarding the constitutionality of

---

[5] The underscored words "has been" in the above quoted excerpt
from the defendants' brief replace the word "is" in G. L. c. 101, § 1.
It appears to us that such rewriting of the statute is thought by the
defendants to be necessary to support their strained construction of it.
This strained construction seems in turn to have been necessitated by
the Attorney General's 1972 disapproval of a proposed town by-law
which would have provided: "Any retail business operating in
Provincetown, whether by an individual or a corporation, must first
obtain a license from the Board of Selectmen." In a letter explaining
the disapproval of the proposed by-law, an assistant attorney general
stated: "[T]he regulating of any and all retail businesses by denial
of a license would be an unreasonable interference with the pursuit of
a vocation, *Opinion of the Justices,* 300 Mass. 615 [1938], 337 Mass.
796 [1958]." By way of dictum, we wish to note that we take a dim
view of the selectmen's obvious attempt to circumvent the Attorney
General's disapproval of the overbroad proposed by-law and of their
attempt to classify every business as transient during the first twelve
months of its existence. Had they desired it, the defendants could
have secured judicial review of the disapproval of the by-law. *Read-
ing* v. *Attorney Gen.* 362 Mass. 266, 269-270 (1972).

the Transient Vendor Statute on its face and as applied. The plaintiff contends that the statute on its face and as applied to her deprives her of equal protection and due process of law. The defendants, rather confusingly, "concede that G. L. c. 101 may have facial invalidity or be procedurally deficient in situations such as the one presented here," but nevertheless assert that "respondent is confident that it has handled the matter in a way consistent with the intent of the legislature, the provisions of the statutes, the relevant court rulings and in a way wholly consistent with its grant of authority and discretion." We do not resolve any of these competing contentions because, regardless of how they might be resolved, we would conclude that the judge should not have enjoined the pending criminal prosecution.

At one time, it was common for courts to express the view that an equity court had no "jurisdiction" to enjoin a criminal prosecution. In *In re Sawyer,* 124 U. S. 200 (1888), the court said, at 210, "The office and jurisdiction of a court of equity, unless enlarged by express statute, are limited to the protection of rights of property. It has no jurisdiction over the prosecution, the punishment or the pardon of crimes or misdemeanors . . .. To assume such a jurisdiction, or to sustain a bill in equity to restrain or relieve against proceedings for the punishment of offences, . . . is to invade the domain of the courts of common law, or of the executive and administrative department of the government." To the same effect, see *Littleton* v. *Burgess,* 14 Wyo. 173, 178-182 (1905).

In this Commonwealth, however, it was early established that courts with general equity powers have the power to restrain criminal prosecutions. In *Shuman* v. *Gilbert,* 229 Mass. 225 (1918), for example, this court recognized the "general rule" that criminal prosecutions are not to be enjoined, but pointed out, at 227, "[T]here is an exception to this comprehensive statement. Jurisdiction in equity to restrain the institution of prosecutions under unconstitutional or void statutes or local ordi-

nances has been upheld by this court when property rights would be injured irreparably, and when other elements necessary to support cognizance by equity are present. *Greene* v. *Mayor of Fitchburg,* 219 Mass. 121, 127 [1914]. *Moneyweight Scale Co.* v. *McBride,* 199 Mass. 503, 505 [1908]."

As pointed out in the *Shuman* case, the occasions when an equity court may properly enjoin a criminal prosecution remain the exception to the "general rule" of nonintervention. Some of the basic policy reasons underlying the rule of nonintervention were well-expressed by the Supreme Court of Hawaii: "Courts of equity are not constituted to deal with crimes and criminal proceedings. They have no power to punish admitted offenders of a challenged penal statute after holding it to be valid, or to compensate those injured by the violations thereof while the hands of the officers of the law have been stayed by injunction. To that extent such courts are incapable of affording a complete remedy. Equity, therefore, takes no part in the administration of the criminal law. It neither aids, restrains, nor obstructs criminal courts in the exercise of their jurisdiction. Ordinarily a court of equity deals only with civil cases involving property rights where it can afford a complete remedy by injunctive relief. Hence it does not interfere in the enforcement of penal statutes even though invalid unless there be exceptional circumstances and a clear showing that an injunction is urgently necessary to afford adequate protection to rights of property so as to circumvent great and irreparable injury until the validity of the particular penal statute is sustained." *Liu* v. *Farr,* 39 Hawaii 23, 35-36 (1950).

Both the *Shuman* and *Liu* cases quoted above indicated that equity would act only to protect "property rights" from irreparable damage by criminal prosecution. In the leading case of *Kenyon* v. *Chicopee,* 320 Mass. 528 (1946), however, we largely rejected the personal rights-property rights distinction as a factor in considering whether an injunction should issue. We con-

sidered this question and said at 534: "We believe the true rule to be that equity will protect personal rights by injunction upon the same conditions upon which it will protect property rights by injunction. In general, these conditions are, [1] that unless relief is granted a substantial right of the plaintiff will be impaired to a material degree; [2] that the remedy at law is inadequate; and [3] that injunctive relief can be applied with practical success and without imposing an impossible burden on the court or bringing its processes into disrepute." This, then, is the test which the probate judge should have applied in considering the request for an injunction, and it is the test which we now apply to the facts before us. In so doing, we assume without deciding that parts (1) and (3) of the *Kenyon* test are satisfied and concentrate on part (2), that is, whether the remedy at law would be adequate in this case.

The plaintiff variously claims that G. L. c. 101, §§ 1-12, is either unconstitutional on its face or as applied, or that the statute, properly construed, does not apply to her at all. In accordance with these claims, she asserts that she cannot be prosecuted for failure to comply with the statute. If we assume, again without deciding the question, that the plaintiff indeed cannot properly be prosecuted under this statute, the issue resolves itself simply to whether the available defenses to the District Court criminal complaint amount to an adequate remedy at law. In the circumstances of this case, we think they plainly do.

In both the *Shuman* and *Kenyon* cases, the question was considered whether, in the circumstances of those cases, the defense to the criminal prosecution provided an adequate remedy at law. Since the injunction was denied in the former case and granted in the latter, it is instructive to compare them.

In the *Shuman* case, six merchants alleged that the defendant chief of police of Northampton threatened to prosecute them for conducting a business without a

license, which they claimed they were not obligated to obtain. The plaintiffs' bill sought to make out a case of irreparable damage and inadequacy of legal remedy by alleging, inter alia, that it would take several months to obtain a decision on the case from an appellate court and that in the intervening period the loss of profits and advantageous business relations would cause the plaintiffs great and irreparable damage. To these averments, a demurrer was sustained. This court upheld the sustaining of the demurrer. After noting that in the event of multiple, oppressive, and wrongful prosecutions, an injunction might properly issue, we said: "A possibility that complaints may be lodged against six persons is not enough under these circumstances to make out a case of multiplicity. The allegations as to repeated complaints are not sufficient to warrant the inference that the courts of this Commonwealth will countenance continued and oppressive prosecutions when once a genuine test case open to fair question has been presented and is on its way to final decision." 229 Mass. at 229 (1918). We further rejected any notion that our courts of criminal jurisdiction could not protect the rights in question: "[The bill] assumes that one innocent of any infraction of the law will be found guilty by the district court and by the Superior Court, a presumption which as matter of law cannot be indulged, at least upon such general allegations. The allegations as to property are nothing more than the ordinary averments which might be made by anybody engaged in business, undertaking a branch of commercial adventure believed by the officers charged with enforcing the law to be in contravention of some penal statute confessedly valid in itself. Simply that one is in business and may be injured in respect of his business by prosecution for an alleged crime, is no sufficient reason for asking a court of equity to ascertain in advance whether the business as conducted is in violation of a penal statute." 229 Mass. at 230 (1918).

In the *Kenyon* case, by contrast, we reversed inter-locutory decrees sustaining demurrers where the bill alleged that members of Jehovah's Witnesses had been repeatedly, on different dates, arrested, prosecuted, and convicted under an unconstitutional ordinance, prohibit-ing distribution of handbills, that on at least two occa-sions a defendant judge had convicted some of the plain-tiffs despite being shown United States Supreme Court decisions holding such an ordinance unconstitutional, that the defendants well knew that the ordinances were un-constitutional and void, that the plaintiffs' means of paying bail fees and of posting bail and appeal bonds were exhausted, and that the defendants had threatened to and would continue to make false arrests, all to the irreparable damage of the plaintiffs' attempts to exer-cise their constitutional rights.   In these circumstances, we held that an injunction against further prosecutions could properly issue, if the allegations were ultimately proved.   We observed: "The plaintiffs' rights are of the most fundamental character.   According to the bill they have been violated repeatedly.   It is plain that the legal remedies by defending against repeated complaints and bringing successive actions for malicious prosecution or false arrest are not adequate."   320 Mass. at 534 (1946).

In the present case, the plaintiff is the subject of a complaint charging a single violation of the statute.   She avers that the statute is either unconstitutional on its face or as applied, or that, properly construed, it is inap-plicable to her.   These averments, of course, would, if established, each constitute a complete defense to the violation charged.   We repeat here a passage from a United States Supreme Court case which applies equally to the matter before us: "It is a familiar rule that courts of equity do not ordinarily restrain criminal prosecutions. No person is immune from prosecution in good faith for his alleged criminal acts.   Its imminence, even though alleged to be in violation of constitutional guaranties, is not a ground for equity relief since the lawfulness or

constitutionality of the statute or ordinance on which the prosecution is based may be determined as readily in the criminal case as in a suit for injunction. . . . It does not appear from the record that petitioners have been threatened with any injury other than that incidental to every criminal proceeding brought lawfully and in good faith, or that a . . . court of equity by withdrawing the determination of guilt from the . . . [criminal] courts could rightly afford petitioners any protection which they could not secure by prompt trial and appeal pursued to this Court." *Douglas* v. *Jeannette*, 319 U. S. 157, 163-164 (1943).

In general, we believe the Federal policy of ordinarily refusing to enjoin pending State criminal prosecutions is sound. This policy, based partly on principles of Federal-State comity and partly on the general equitable principles we have summarized in this opinion, *Younger* v. *Harris*, 401 U. S. 37, 43-44 (1971); comment, 6 Suffolk U. L. Rev. 750, 752 (1972), prohibits equitable interference with criminal prosecutions absent "very special circumstances." *Younger* v. *Harris, supra,* at 45. "Very special circumstances" may be merely a shorthand way of requiring a stricter application of general equitable principles, for example, that no injunction will issue unless the plaintiff will suffer irreparable and immediate injury without it. But however the concept is phrased, the necessity of defending a single criminal prosecution rarely, if ever, justifies issuance of the injunction. *Younger* v. *Harris, supra,* at 46. See *Bisbee* v. *Arizona Ins. Agency,* 14 Ariz. 313, 314-317 (1912); *Sullivan* v. *San Francisco Gas & Elec. Co.* 148 Cal. 368, 371-373 (1905); *Denver* v. *Beede,* 25 Colo. 172 (1898); *Liu* v. *Farr,* 39 Hawaii 23, 33-37 (1950).

Our decision would not be different if we were considering only those portions of the proceedings below which involved a request for and grant of declaratory relief under G. L. c. 231A, §§ 1, 2. The fundamental jurisprudential considerations underlying the general pro-

hibition against enjoining a pending criminal prosecution apply with full force to support a prohibition against issuing declaratory decrees concerning a pending criminal prosecution.    To conclude otherwise would encourage fragmentation and proliferation of litigation and disrupt the orderly administration of the criminal law.[6]

The rule we adopt today in regard to the issuance of declaratory judgments when criminal litigation is pending is merely a logical extension of our rules which generally proscribe the issuance of such a judgment when an appropriate administrative proceeding is in progress, *East Chop Tennis Club* v. *Massachusetts Commn. Against Discrimination,* 364 Mass. 444, 452-453 (1973), or when a civil proceeding in which the same issue is or can be raised is already pending between the parties.  *Jacoby* v. *Babcock Artificial Kidney Center, Inc.* 364 Mass. 561, 562-564 (1974).   In the latter case we said: "Generally '[a] court cannot declare rights as to matters involved in a prior pending action.'   Anderson, Actions for Declaratory Judgments (2d ed.) § 209 (1951).   While declarations of right may be appropriate in exceptional cases even when other proceedings are in progress, there is an ordinary presumption against such relief. . . . In the *East Chop* case we stated that 'the existence of . . . [a] dispute alone is insufficient reason to disrupt the ordinary administrative process.'  . . . This applies a fortiori to

---

[6] "The modern declaratory action to construe or invalidate a penal statute bears the important distinction that it does not disrupt a pending prosecution, but seeks to resolve legal issues to prevent prosecution.   Whereas prosecution can only follow conduct, the modern declaratory action precedes it, and in that difference lies its cardinal function.   Cases do appear in which the plaintiff seeks a declaratory judgment after having acted, either racing to the court ahead of the prosecutor or with prosecution formally pending, but the courts refuse the remedy to prevent needless proliferation of litigation.   Once the disputed conduct has taken place, the equities of the statute itself can be at least as well litigated in defense to the prosecution thus ripened."   Note, Declaratory Relief in the Criminal Law, 80 Harv. L. Rev. 1490, 1503-1504 (1967).

pending court proceedings. The declaratory relief procedure was not intended to permit the same claim to be adjudicated in multiple suits." 364 Mass. at 563 (1974). In applying these principles in the criminal prosecution context, we follow the Federal rule, *Samuels* v. *Mackell,* 401 U. S. 66, 69-73 (1971); *Kugler* v. *Helfant,* 421 U. S. 117, 123-131 (1975), and the rule adopted in most States which have considered the issue. See, for example, *Taylor* v. *Cooper,* 60 So. 2d 534, 535-536 (Fla. 1952); *Staub* v. *Mayor of Baxley,* 211 Ga. 1, 2 (1954); *Ostrander* v. *Linn,* 237 Iowa 694, 700-710 (1946) (special circumstances found present justifying declaratory relief); *Grimm* v. *County Commrs. of Washington County,* 252 Md. 626, 631-641 (1968); *Updegraff* v. *Attorney Gen.* 298 Mich. 48, 49-52 (1941); *Nelson* v. *Knight,* 254 Ore. 370, 372-374 (1969); *Johnson City* v. *Caplan,* 194 Tenn. 496, 498-499 (1952). But see *Goodwin* v. *Louisville,* 309 Ky. 11, 12-13, 17 (1948); *Kraus* v. *Birns,* 241 N. Y. S. 2d 189, 191 (1963). Cases in which declaratory relief was granted where no criminal prosecution was actually pending are, of course, readily distinguishable. *Steffel* v. *Thompson,* 415 U. S. 452, 475 (1974). *Sun Oil Co.* v. *Director of the Div. on the Necessaries of Life,* 340 Mass. 235, 239 (1960). *Commonwealth* v. *Baird,* 355 Mass. 746, 755 (1969). *Mobil Oil Corp.* v. *Attorney Gen.* 361 Mass. 401, 405-406 (1972). See, generally, anno. Validity, Construction, and Application of Criminal Statutes or Ordinances as Proper Subject for Declaratory Judgment, 10 A. L. R. 3d 727 (1966 and Supp. 1974); note, Declaratory Relief in the Criminal Law, 80 Harv. L. Rev. 1490 (1967).

For the reasons given above, the injunction and declaratory relief should not have been granted. The final decree is reversed and a new judgment is to be entered dismissing the bill.

*So ordered.*