Barbara ZUKOWSKI, individually and as conservator and guardian of Charles Zukowski, a protected person, and as parent and next of kin of David Michael Zukowski, a minor; Maria Magdalena A De Ruiz, individually and as parent and next of kin of Angelica M. Ruiz, Arturo Ruiz, Jr., and Jessica Ruiz, minors, and Fidelity and Guaranty Insurance Underwriters, Inc., Plaintiffs,

v.

HOWARD, NEEDLES, TAMMEN, AND BERGENDOFF, a general partnership, Defendant.

Civ. A. No. 85–K–2690.

United States District Court, D. Colorado.

March 9, 1987.

John G. Salmon and Dean R. Vanatta, Denver, Colo., for plaintiffs.

William H. Knapp, Denver, Colo., for defendant.

ORDER AND MEMORANDUM OPINION ON MOTION FOR RECONSIDERATION

KANE, District Judge.

On February 9, 1987 I denied plaintiffs' motion for an expedited trial date. Plaintiffs now move me to reconsider my ruling. No trial date has yet been set. The parties have been ordered to appear on March 10, 1987 for a trial setting. A pre-trial order was filed on February 6, 1987 contempora-

neously with the motion for expedited trial date. The parties estimate trial will consume ten days. Plaintiffs counsel has been advised the earliest available trial date for a ten day trial on my docket is in June or July, 1988.

I gave full consideration to the motion when I first denied it. Due to the exigencies which will be discussed presently, I did not articulate the reasons for denial. Instead I made mention of Local Rule 200 (Revised as of December, 1985) which provides in part, but in carefully explicated detail, that diversity cases will be scheduled for hearings and trials only as time becomes available. The rule provides further that "[e]xceptions will be made where it can be shown that delay will result in extraordinary hardship."

Plaintiffs present a two-pronged argument: First, the rule is criticized for "relegating all diversity cases to the basement of the Court' (sic) priority list" and, possibly, though not explained, for violating the constitutional rights of the plaintiffs. Second, even if the rule is applied, plaintiffs insist the exception of extreme hardship is more than met. The arguments shall be addressed in the same sequence.

■ Because reference is made and the issue is of obvious importance, I set forth the rule in its entirety:

### Rule 200.  Policy, Forms and Drawings

As required by 28 U.S.C. § 1657, as amended by Public Law No. 98-620 (H.R. 6163), the Court must set forth its policy regarding the priority assigned to cases on the Court's docket. Recognizing that the courts of the State of Colorado are competent, fair and impartial tribunals, and that those courts are functioning efficiently and effectively without any indication of discrimination against the citizens of other states, and that the underlying purpose of diversity jurisdiction is the prevention of such discriminatory treatment, it is the policy of this Court henceforth to consider cases filed under 28 U.S.C. § 1332 to have the lowest priority. Therefore, such cases will be scheduled for hearings and trials only as time becomes available. Diversity cases which could be resolved by arbitration or mediation will receive the lowest priority of all. Exceptions will be made where it can be shown that delay will result in extraordinary hardship. Diversity cases which are removed from state courts to this Court will be promptly scrutinized for any indication that removal has been sought for purposes of delay. If such purpose appears in a particular case, it will be expedited for all proceedings and for trial. It is the further policy of the Court to recognize that in areas of unsettled law a due regard for principles of federalism may dictate deferral until a state court precedent becomes available.

Before 1984 there were more than 30 statutes passed by the Congress which declared the particular civil action addressed in each instance was to receive priority. It simply was not possible to obey one such statute without violating the others. In Public Law 98–620, Title IV, § 401(a), Nov. 8, 1984, 98 Stat. 3356 (now codified as 28 U.S.C. § 1657) Congress addressed this problem. It provided each court of the United States must determine the order in which civil actions will be heard and determined except that it created its own priority as well.

The exception is illuminating of congressional intent.

(a) Notwithstanding any other provision of law, *each court* of the United States *shall* determine the order in which civil actions are heard and determined, except that the court shall expedite the consideration of any action brought under chapter 153 [habeas corpus] or section 1826 of this title, [recalcitrant grand jury witnesses], any action for temporary or preliminary injunctive relief, or any other action if good cause therefor is shown. *For purposes of this subsection, 'good cause' is shown if a right under the Constitution of the United States or a Federal Statute* (including rights under section 552 of title 5) would be maintained in a factual context that

indicates that a request for expedited consideration has merit.

(b) The Judicial Conference of the United States may modify the rules adopted by the courts to determine the order in which civil actions are heard and determined, in order to establish consistency among the judicial circuits. [Emphasis added.]

It is abundantly clear that Congress intended to give preference on crowded court dockets to federal questions. Arguably, only the Judicial Conference of the United States has the power to review or modify rules adopted by the courts in fulfillment of this statutory mandate.

Before implementing the statute, it was necessary for this court to provide a preferential system for the trial of criminal cases. Rule 50, Fed.R.Crim.P. provides "... [p]reference shall be given to criminal proceedings as far as practicable." As the Advisory Committee on Rules observes, "This rule is a restatement of the inherent residual power of the court over its own calendars,...." The principle of criminal case preference was then made a practical necessity by the enactment of the Speedy Trial Act, 18 U.S.C. § 3161 *et seq.* While some minor adjustments can be made, there is no longer any doubt criminal cases must take precedence over civil cases on a federal court's docket. Regrettably, I have found it necessary in some instances to vacate civil trial settings in order to comply with the Speedy Trial Act.

The setting of criminal cases in compliance with the Speedy Trial Act has been met with considerable criticism by commentators, prosecutors, criminal defense attorneys and the civil trial bar as well.[1] Such criticism, however, is not a matter of judicial inquiry. The same point must be made with reference to the status of diversity cases. The tone, if not the actual rhetoric, of plaintiffs' motion to reconsider denial of plaintiffs' motion for expedited trial date suggests this court holds diversity cases in disdain. I am quite sure that, as with most

contemporary issues, the views of the members of this court would vary. Such views, however, are wholly irrelevant both in constitutional and statutory terms to exercise of the judicial function.

Article III, Section 2 of the Constitution provides:

In all cases affecting Ambassadors, other public Ministers and Consuls, and those in which a State shall be a Party, the supreme Court shall have original Jurisdiction. In all the other Cases before mentioned, the supreme Court shall have appellate Jurisdiction, both as to Law and Fact, with such Exceptions, and under such Regulations as the Congress shall make.

It is entirely up to the Congress "To constitute Tribunals inferior to the supreme Court." Article I, Section 8. Pursuant to that authority Congress enacted 28 U.S.C. § 1332 which provides in part that the district courts shall have original jurisdiction of civil actions where the matter in controversy exceeds the sum or value of $10,000, exclusive of interest and costs and is between citizens of different states. This law was passed by the Congress in accordance with the authority vested in it by the Constitution. As long as the law remains in effect, it is the solemn obligation of the courts to abide by it.

In each Congress of recent memory, various bills have been introduced to modify or eliminate diversity jurisdiction. It is clearly fitting and proper for Congress to consider such legislation. It is equally clear the courts have no authority to legislate. Unless and until such legislation is finally enacted into public law, it remains a political issue and hence is irrelevant to any judicial consideration.

By virtue of the same constitutional authority, the Congress has required the courts of the United States to determine the priority in which civil actions are heard and determined. Meeting that obligation has required the judges to consider the

---

1. *E.g.,* 44 Brooklyn L.Rev. 757 (Summer 1978); 27 Catholic U.L.Rev. 627 (Spring 1978); 2 Nat.J. Crim.Defense 1 (Spring 1976); 62 A.B.A.J. 862 (July, 1976).

needs and requirements intrinsic to the circumstances of the court's function. Two premises control the outcome of that consideration: First, more cases are filed than can ever be heard and determined. Thus, as of February 1, 1987, there were 2,151 civil cases pending in this court. Second, the number of judges needed to resolve all cases will never correlate with the number of judges actually serving. In consequence of these premises, it is not possible to accommodate each case filed according to its internal needs. Therefore, the attention received by each case must be allocated on a discrete basis.

There are more than 150 federal statutes enacting special jurisdictional provisions. *See* Historical and Revision Notes, 28 U.S.C. § 1332. The essential and uncontrovertible distinction between federal question jurisdiction and federal party jurisdiction on the one hand and diversity jurisdiction on the other is one of exclusivity. In the first instance, the federal courts almost always provide the only forum in which those cases can be heard and determined. In the second instance, however, diversity cases have at least one alternative forum readily available. Even when diversity jurisdiction is exercised by a federal court, the substantive law of the state must be followed. The reason for giving priority to cases which can be heard and determined in one court only in preference to cases which can be tried in at least one and usually two other court systems should be obvious.

Plaintiffs argue, however, that the purpose of diversity jurisdiction is to provide a forum free of local prejudices and sectional views. Since judges and juries are selected from the same geographic section and required to apply the same law, it is difficult to see how any difference would occur between the federal and state courts.[2] Giving the argument its full force and effect is particularly tenuous in the instant case because the plaintiffs are residents of the same state and federal district in which the consolidated actions were brought. In this case, it is the defendant partnership which is a non-resident. The authorities cited by plaintiffs, including James Madison, support the need for diversity jurisdiction in the context of a foreign citizen making claims against resident defendants, not resident plaintiffs making claims against non-resident defendants.

Finally, in pursuing this prong of their argument, plaintiffs take umbrage with the assertion of this court in Local Rule 200 that the courts of the State of Colorado are competent, fair and impartial tribunals. The suggestion is that this recitation is made from whole cloth though plaintiffs do not proffer a single fact to rebut it. First, our Constitution provides that full faith and credit must be given to the legal proceedings of each state. Second is the time-honored presumption that proceedings are valid and lawful until proven otherwise. Third is the entire case history of this court when it has sat in review of state court proceedings and adjudicated the very point recited. Fourth, and most important, are the legions of United States Supreme Court cases directing federal courts to give great deference to state governments and particularly so in the case of state courts. *See, e.g., Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971) and *Railroad Commission v. Pullman*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). Even in individual cases where some error has occurred, the system in place in the State of Colorado contains self-correcting mechanisms which, in some instances, are superior to those provided in the federal system. It is beyond cavil that the availability of judges to try cases is significantly greater in the State of Colorado than it is in the District of Colorado.

■ The second prong of plaintiffs' argument relates to the provision in Local Rule 200 that exceptions can be made in

---

**2.** At the time of the writing of the Constitution and for a considerable period thereafter, it is to be recalled that federal judges rode circuit. The justification of avoiding local prejudice had more efficacy then than now when more sedentary conditions obtain.

cases of extraordinary hardship. The facts alleged in the case present serious and significant conditions for the plaintiffs. The action is based on the collapse of a bridge section while under construction. One plaintiff who is married and the parent of a minor child has undergone several surgeries and remains comatose from the date of injury to the present day. Attached to the motion for reconsideration is a letter from the Director of the Neurotrama Unit at Swedish Hospital which says that the plaintiff, Zeke Zukowski, "is manifesting signs of awareness of the environment." Further, he is in need of 24 hour private care and is at constant risk of infection and pulmonary obstruction. His family is presently living on social security and worker's compensation benefits supplemented by income from part-time employment of his wife.

The other complaint in this consolidated action was filed by Maria Ruiz whose husband, Arturo Ruiz, died at the time of the bridge section collapse. She and her three children presently live on worker's compensation and social security benefits. Mrs. Ruiz speaks little English and lacks training, making her presently unsuitable for gainful employment. As a result of her husband's death, the family has suffered a substantial reduction in income. Title to the family home has been transferred back to the original lenders.

The other plaintiff in the case is Fidelity and Guaranty Insurance Underwriters, Inc. which claims a subrogation interest in any favorable judgment for worker's compensation benefits in accordance with Colorado Revised Statutes 8–52–108. The defendant is the designer of the bridge, including the section that collapsed. Liability is alleged on a theory of negligent design and preparation of plans. Breach of contract and punitive damage claims are pleaded as well. Liability is denied and affirmative defenses including immunity are asserted. Over 40 testifying witnesses are listed in the pre-trial order. An additional 39 witnesses may be called.

Given the number of witnesses and exhibits listed in the pre-trial order, it is doubtful that the case can be tried in the two weeks suggested by counsel. The court is not in a position to improve on the estimate of trial time made by counsel, but even so must provide for additional time on a contingent basis by setting brief bench trials for the week following the time reserved for trial of this case.

Whether this case can be considered as involving extraordinary hardship is not capable of easy or obvious determination. The answer is largely dependent upon the perspective from which the problem is viewed. When seen from the present plaintiffs' coign of vantage, the case is clearly extraordinary and there is no doubt the plaintiffs are enduring extreme hardship. I do not wish to be understood for even a second as demeaning or deprecating the importance of this case to the plaintiffs and, for that matter, to their counsel. Experience shows, however, that should plaintiffs obtain a substantial verdict, and surely the possibility of such a verdict is present, the likelihood of further delay occasioned by an appeal is almost inevitable. Thus, an expedited trial date is no guaranty at all of relief from the hardships which plaintiffs experience.

When viewed from the position of other litigants in cases already set for trial, whose trials would have to be continued in order to accommodate an expedited trial of this case, the extraordinary nature of the instant plaintiffs' hardship is not so obvious. I have serious doubts it is even possible to judge degrees of hardship on a comparative basis. Cases presently set for trial include foreclosure of a family farm that has been in the same family for generations, breach of contract where the jobs of over 300 wage earners are at stake, product liability actions with plaintiffs confronting inevitable pain and death from asbestosis, securities fraud cases where retired persons claim the loss of their entire savings for retirement, medical malpractice involving permanent brain damage and railroad disability cases involving multiple amputations. This is only a partial list; the

point is this court is adrift in a sea of hardship and tragedy.

When considered from the perspective of the public interest, the degree of hardship is less than extraordinary. As alluded to in 28 U.S.C. § 1657, *supra,* this case does not involve "a right under the Constitution of the United States or a Federal Statute...." Further, it does not involve issues of public safety. It is not a class action. It does not involve the public fisc. It does not involve contamination of the environment that would endanger not only this generation but future generations as well. As a matter of public interest this case is not distinguishable from other cases involving the private rights of a limited number of individuals. That particular public interest is the provision of a forum where such controversies can be adjudicated in a peaceable and orderly fashion.

The foregoing explication, however, begs the question of why litigants must wait 15 months for a trial from the date their case is ready to be heard. I could not agree more with plaintiffs' strident pronouncement that justice delayed is justice denied. I suffer no illusions that time and justice are unrelated. Frankly, the answer to this quintessential question is not at all satisfactory. Succinctly stated, this court is at an impasse.

As of March 1, 1987 I was assigned and had pending 374 of the 2,091 civil cases pending in this court and an additional 79 cases pending in the District of Utah. Before cases can be brought to issue and tried, motions must be considered and ruled upon. Of the 2,091 civil cases in this district, 883 have motions pending. In the 374 cases assigned to me, 112 have motions pending. (Virtually all 79 Utah cases have motions pending.) Between today's date and June 1, 1988, there is not one week on my calendar in which cases are not set for trial or other evidentiary hearings. Of the 60 or so weeks included in the period, criminal trials will consume 20. No time has been reserved for vacation, conferences or other non-essential events.

It is, of course, probable that some settings will be vacated as cases settle or are otherwise dismissed. The most vexing problem, however, is that the parties and their counsel frequently wait until the day set for trial or shortly before to settle so that there is insufficient time available to call in other cases for trial. In order to reduce this vacancy rate most judges, and I among them, resort to a complicated and arcane practice of double or triple setting. Through experience, cases are so set on an imprecise estimate of the probability that certain cases will settle. Occasionally we get caught with two of the three cases ready for trial. In those instances we look for one of our fellow judges to help out. If more than three cases are set at the same time, however, the system loses its credibility.

The only way presently known to reduce the delay in obtaining trial dates is to reduce the number of cases assigned to each judge. This reduction is accomplished by a combination of lowering the number of cases filed and increasing the number of judges. Case filings have not decreased and there is no reason to believe they ever will.

By constantly developing new methods of procedure and administration, the judges of this district have been able in the last 10 years to increase the case disposition average from 18 to 30 cases per month per judge. Unfortunately, the number of case filings has increased at an even greater rate.[3] Congress has provided for two additional judges for this district. Yet one vacancy has existed since October, 1984 and the other since May, 1985.[4] Those

---

3. The statement requires some elaboration since case filings fluctuate. The more serious problem, which hard numbers do not reveal, is that the nature of both civil and criminal cases is changing from relatively short and simple cases to those that are increasingly complex and more time consuming.

4. Presently, there are five judges in active service on the court who are ably and graciously assisted by two senior judges.

vacancies constitute a total of 51 judicial months which if filled would have resulted in the disposition of approximately 1,530 additional cases. Since there are always at least two sides to a case, at the very least 3,060 people and businesses have been deprived of their day in court during the past 29 months. That this deprivation continues, and the waiting time for an available trial date increases, cannot reasonably be attributed to the rule of this court providing that diversity cases will be tried on a time available basis or to the inability of the court to provide preferential trial dates.

For the foregoing reasons, upon reconsideration, the motion for an expedited trial date is again denied. From time to time, judges from outside this district become available to try cases. If I can persuade such a judge to visit here for two or three weeks and obtain the necessary bureaucratic clearances, I shall attempt to have this case tried in advance of its setting on the docket. Should the other constituent branches of the federal government ever get around to filling the existing vacancies, it is probable that cases can be transferred and earlier trial dates obtained. In the meantime, I must necessarily adhere to the Court's local rule and give this case a certain trial date when the time is available.[5]

---

**5.** I realize this is an unusual opinion. One does not usually get into such detail in articulating the reasons for a trial setting. It is obvious that such energies could have been directed to a more noticeably productive purpose. The tintinnabulations of the problems which ring today, however, echo far beyond the range of the parties to this litigation. These problems manifest themselves throughout my docket and, perhaps, though I don't speak for my colleagues on this court, throughout their dockets as well. Accordingly, I am directing publication of this memorandum opinion.